**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Marilyn Kelly

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway

FILED JULY 31, 2009

RICK PETERSEN,

       Plaintiff-Appellee,

v

MAGNA CORPORATION and MIDWEST
EMPLOYERS CASUALTY COMPANY,

       Defendants-Appellants.

and

KOLEASECO and THE ACCIDENT FUND
COMPANY; MAGNA CORPORATION and
TIG INSURANCE COMPANY; BCN
TRANSPORTATION SERVICES and TIG
INSURANCE COMPANY; KOLEASECO,
INCORPORATED and CITIZENS
INSURANCE COMPANY; BCN
TRANSPORTATION SERVICES; SERTA
RESTOKRAFT MATTRESS COMPANY,
INCORPORATED and HARLEYSVILLE
LAKE STATES INSURANCE COMPANY,

       Defendants-Appellees.

Nos. 136542, 136543

BEFORE THE ENTIRE BENCH

KELLY, C.J.

We granted leave to appeal in this case to determine the parties against

whom attorney fees may be prorated under MCL 418.315(1). We conclude that

the term "prorate" in MCL 418.315(1) applies only to employers and their insurance carriers. Accordingly, we affirm the judgment of the Court of Appeals.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case involves a dispute over workers' compensation benefits. Plaintiff Rick Petersen began working for codefendant Koleasco, a trucking company, in February 1997. In March 1997, Koleasco hired codefendant BCN Transportation Services (BCN), a human resources "employee leasing" company, to administer its employee benefits.

In November 1997, plaintiff was injured when he fell from a flatbed truck while securing a load of Christmas trees. After the accident, he underwent surgery on his right foot and applied for workers' compensation benefits. The following year, he required treatment for back pain, which his treating physician believed was caused by the November 1977 fall.

Several questions were taken to a workers' compensation magistrate: (1) who was plaintiff's employer at the time of his injury, BCN or Koleaseco? (2) was Midwest the relevant insurer for workers' compensation purposes? (3) was plaintiff disabled? and (4) if so, which injury caused his disability? The magistrate bifurcated these issues into two trials.

In the first trial, the magistrate ruled that plaintiff was a Koleaseco employee on the date of his injury despite the fact that BCN paid his wages. Thus, because BCN had stipulated that it was plaintiff's employer, the magistrate ruled that both BCN and Koleaseco were plaintiff's employers and both were liable for

2

plaintiff's workers' compensation benefits. On appeal, the Workers' Compensation Appellate Commission (WCAC) affirmed that ruling.

In the second trial, the magistrate considered (1) was plaintiff's counsel entitled to an attorney fee of 30 percent of plaintiff's medical bills unpaid by defendant? and (2) who was responsible for paying plaintiff's future medical and weekly benefits? With respect to plaintiff's attorney fees, the magistrate ruled:

> [A]lthough Midwest . . . was paying the plaintiff weekly benefits, it refused to pay medical bills related to [plaintiff's] injury. . . . The total amount of the medical bills incurred . . . which defendant refused to pay is $153,448.54. I find that plaintiff's counsel is entitled to a 30 percent attorney fee for these unpaid medical bills under Section 315(1). . . .

With respect to whether BCN or Koleaseco was responsible for paying plaintiff's ongoing medical and weekly benefits, the magistrate ruled that BCN and its insurance carrier, Midwest, were primarily responsible.

Again, both parties appealed to the WCAC, which affirmed the award of attorney fees, observing:

> While the magistrate failed to explicitly so find, in this case . . . defendant knew of the medical bills in question well in advance of trial, and simply refused to pay them claiming they were not work related. Once the magistrate so found, given that prior knowledge and refusal to pay, the action in awarding attorney fees was within his discretion and hence proper.

Magna Corporation, another "employee leasing" company insured by Midwest, and Midwest sought leave to appeal both WCAC orders. The Court of Appeals initially denied the applications.[1] We remanded the case as on leave granted.[2]

On remand, the Court of Appeals affirmed the WCAC.[3] The Court found that competent evidence supported the factual findings of both the magistrate and WCAC with respect to plaintiff's employment. Regarding the assessment of attorney fees, the Court held that § 315(1) is ambiguous because it does not identify the entity against which the magistrate may assess such fees.[4]

The Court concluded, "[W]here the remainder of [§ 315(1)] discusses the employer and/or the [insurance] carrier, it follows that the attorney fees are to be calculated or divided between those entities. The plain language of the statute does not mandate that the health care provider assume responsibility for any

---

[1] *Petersen v Magna Corp*, unpublished order of the Court of Appeals, entered April 11, 2006 (Docket No. 266037); *Petersen v Magna Corp*, unpublished order of the Court of Appeals, entered April 11, 2006 (Docket No. 266177).

[2] *Petersen v Magna Corp No 1*, 477 Mich 871 (2006); *Petersen v Magna Corp No 2*, 477 Mich 871 (2006).

[3] *Petersen v Magna Corp*, unpublished opinion per curiam of the Court of Appeals, issued April 17, 2008 (Docket Nos. 273293 and 273294), at 8.

[4] *Id*. at 9.

4

portion of those fees."[5]   We granted leave to appeal to consider the proper interpretation of § 315(1).[6]

## II. MCL 418.315(1)

The proper interpretation and application of a statute presents a question of law that we review de novo.[7]   MCL 418.315(1), part of the Worker's Disability Compensation Act (WDCA),[8] provides in pertinent part:

> The employer shall furnish, or cause to be furnished, to an employee who receives a personal injury arising out of and in the course of employment, reasonable medical, surgical, and hospital services and medicines, or other attendance or treatment recognized by the laws of this state as legal, when they are needed. . . .  After 10 days from the inception of medical care as provided in this section, the employee may treat with a physician of his or her own choice by giving to the employer the name of the physician and his or her intention to treat with the physician.   The *employer or the employer's carrier* may file a petition objecting to the named physician selected by the employee and setting forth reasons for the objection.   If *the employer or carrier* can show cause why the employee should not continue treatment with the named physician of the employee's choice, . . . the . . . magistrate may order that the employee discontinue treatment with the named physician or pay for the treatment received from the physician . . . .   If the employer fails, neglects, or refuses so to do, the employee shall be reimbursed for the reasonable expense paid by the employee, or payment may be made in behalf of the employee to persons to whom the unpaid expenses may be owing, by order of the workers' compensation magistrate.   *The workers' compensation magistrate may prorate*

---

[5] *Id*. at 10.

[6] *Petersen v Magna Corp*, 482 Mich 994 (2008).

[7] *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008).

[8] MCL 418.101 *et seq*.

5

*attorney fees at the contingent fee rate paid by the employee.* [Emphasis added.]

## A. Statutory Interpretation

This is a case of statutory interpretation. The primary goal of such interpretation is to give effect to the intent of the Legislature.[9] The first step in ascertaining such intent is to focus on the language of the statute itself. If statutory language is unambiguous, the Legislature is presumed to have intended the meaning expressed in the statute.[10] The words of a statute provide the most reliable evidence of the Legislature's intent, and as far as possible, effect should be given to every phrase, clause, and word in a statute.[11] If the statutory language is certain and unambiguous, judicial construction is neither required nor permitted, and courts must apply the statute as written.[12]

However, when statutory language is ambiguous, this Court has consistently held that a court construing it may go beyond the plain language of the statute.[13] In fact, where the language leaves the statute's meaning ambiguous, it is the duty of the courts to construe it, giving it an interpretation that is

---

[9] *Brown v Detroit Mayor*, 478 Mich 589, 593; 734 NW2d 514 (2007).

[10] *Id*.

[11] *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999) (quotation marks and citations omitted).

[12] *Turner v Auto Club Ins Ass'n*, 448 Mich 22, 27; 528 NW2d 681 (1995).

[13] *Id*. at 236, citing *Luttrell v Dep't of Corrections*, 421 Mich 93; 365 NW2d 74 (1984).

reasonable and sensible.[14]   Therefore, a finding of ambiguity has important interpretive ramifications.

In this case, the Court of Appeals held that the last sentence of § 315(1) is ambiguous in that it is unclear who is responsible for an injured employee's attorney fees.   Thus, the threshold question is whether, in light of the plain language of the entire provision, the last sentence of § 315(1) is ambiguous.

Section 315(1) gives magistrates the discretionary authority to prorate attorney fees at the contingent fee rate paid by the employee.   "Prorate" means "to divide, distribute, or calculate proportionately."[15]   In § 315(1), the term "prorate" could reasonably apply to employers, their insurance carriers, health care providers, employees seeking workers' compensation benefits, or to any combination of them.   Moreover, neither § 315 as a whole nor any other provisions of the WDCA indicates the parties to whom a division or distribution of attorney fees applies.

I agree with the Court of Appeals conclusion that the final sentence of § 315(1) applies only to employers and their insurance carriers.   This is because that interpretation harmonizes the final sentence with the remainder of § 315(1).   The

---

[14] *Crary v Marquette Circuit Judge*, 197 Mich 452, 454; 163 NW 905 (1917).

[15] *Random House Webster's College Dictionary* (2001).

7

final sentence does not stand alone.[16] It must be construed in the context of §

315(1) in its entirety and harmonized with the statute's other provisions to satisfy

the purpose intended by the Legislature.[17]

Here is how that construction operates. Section 315(1) concerns employer

liability to pay medical benefits to workers injured in the course of employment.

The statute as a whole provides a process for employers and their insurance

carriers to object to the medical treatment that an injured employee seeks. Hence,

"prorate" in the final sentence of § 315(1), when read with the remainder of the

statute, applies to the parties who might contest the payment of medical benefits:

employers and their insurance carriers.[18] This interpretation unifies the last

sentence of § 315(1) with the remainder of the statute.

I now consider the Legislature's use of the word "may" with respect to

prorating attorney fees. The word "may" is permissive in nature. As applied to

"prorate," "may" indicates that magistrates have discretion in determining whether

---

[16] Under the doctrine of *noscitur a sociis*, the meaning of an unclear word or phrase should be determined by the words immediately surrounding it. *People v Couzens*, 480 Mich 240, 250; 747 NW2d 849 (2008).

[17] *Farrington v Total Petroleum, Inc*, 442 Mich 201, 209; 501 NW2d 76 (1993).

[18] Justice Markman would hold medical providers responsible for a proration of attorney fees. In support of this claim, he cites MCL 418.827, which provides a basis for nonparty employers to recover through the efforts of an employee's attorney pursuing a third-party liability action. Had the Legislature intended a scheme in § 315 similar to that provided in § 827, it could have used similar or identical language. However, it did not do so.

to award attorney fees.  Hence, magistrates are allowed to award attorney fees, but they are not required to do so.[19]

Likewise, the word "may" bears on whether a proration must occur if a magistrate does award attorney fees.  I would hold that the use of the word "may" grants magistrates the discretion to prorate attorney fees among employers and their insurance carriers.  Should a magistrate determine that only one of those parties is liable, the magistrate may impose attorney fees against only that party.  Conversely, should the magistrate find multiple parties liable, fees may be prorated accordingly.  This interpretation affords the phrase "may prorate" its full meaning.[20]

Nonetheless, as evidenced by the dissents in this case, competing reasonable interpretations of § 315(1) exist when its language alone is considered.[21]  In fact, the words of § 315(1), in light of the entire statute and the

---

[19] The Legislature often vests discretion in magistrates using the word "may."  Other provisions of the WDCA that vest discretion in magistrates using the word "may" include MCL 418.321, MCL 418.335, MCL 418.345, and MCL 418.835.

[20] Contrary to Justice Markman's contention, this interpretation does not "read[] an authorization into the statute."  *Post* at 8.  Nothing in the definition of "prorate" indicates that one party cannot be apportioned zero liability.  A "division" or "distribution" does not require that both parties subject to that division receive an assessment of liability.  For example, liability could be allocated on a 50-50, 75-25, or 100-0 basis, depending on the magistrate's allocation of fault and the number of parties involved.

[21] Justice Markman claims that I "withdraw[] from the process of statutory interpretation once other interpretations are presented."  *Post* at 17.  This is

---

WDCA, do not clearly indicate the parties to whom a proration of attorney fees applies. As a consequence, I am unable to ascertain the intent of the Legislature based solely on the language of the statute. I turn next to the question whether § 315(1) is ambiguous.

### 1. *Lansing Mayor v Pub Service Comm*

This Court's most recent pronouncement on the proper standard for discerning whether statutory language is ambiguous was espoused in *Lansing Mayor v Pub Service Comm*.[22] In that case, the Court examined MCL 247.183 to determine whether it required a company to obtain local government consent before beginning pipeline construction. Critical to the Court's analysis was its discussion of the proper method for discerning statutory ambiguity.

The Court stated that statutory provisions are not ambiguous unless one "irreconcilably conflicts" with another or unless a term is "equally susceptible to more than a single meaning."[23] Applying this definition, the *Lansing Mayor* majority observed that "[o]nly a few provisions are truly ambiguous."[24]

---

incorrect. Section 315(1) refers to multiple parties and lacks an indication of which of them is subject to a proration of attorney fees. No other provision in the WDCA resolves the question. From that I conclude that the statute is capable of being understood by reasonably well-informed persons in two or more different senses. See *infra* at 33-34.

[22] *Lansing Mayor v Pub Serv Comm*, 470 Mich 154; 680 NW2d 840 (2004).

[23] *Id*. at 166. Since having announced this exceedingly narrow definition of "ambiguity," the Court has declined to find any statutory language ambiguous.

[24] *Id*.

10

*Lansing Mayor*'s definition of "ambiguity" is unsupported by any Michigan law whatsoever, having been derived, as it were, from thin air.[25] *Rusinek v Schultz, Snyder & Steele Lumber Co* is the only Michigan case predating *Lansing Mayor* that employs the language "equally susceptible."[26] However, *Rusinek* did not state that language is ambiguous only if it is equally susceptible to different interpretations. Instead, *Rusinek* simply held that statutes in derogation of common law must be strictly construed.[27]

Also unsupported as a threshold for finding ambiguity is the "irreconcilably conflicts with another provision" language found in *Lansing Mayor*. The *Lansing Mayor* majority cited *Klapp v United Ins Group Agency, Inc*[28] for this definition of "ambiguity," but *Klapp* simply states that language is ambiguous when "its provisions are capable of conflicting interpretations."[29] It neither requires an irreconcilable conflict nor that the language be equally susceptible to more than one interpretation. Thus, the two-pronged "equally susceptible" and

---

[25] See Kelly and Postulka, *The fatal weakness in the Michigan Supreme Court majority's textualist approach to statutory construction*, 10 TM Cooley J Prac & Clinical L 287, 289 (2008).

[26] *Rusinek v Schultz, Snyder & Steele Lumber Co*, 411 Mich 502; 309 NW2d 163 (1981).

[27] *Id*. at 507-508.

[28] *Klapp v United Ins Group Agency, Inc*, 468 Mich 459; 663 NW2d 447 (2003).

[29] *Id*. at 467.

"irreconcilably conflicts" test adopted in *Lansing Mayor* has no basis in Michigan law.

Furthermore, the *Lansing Mayor* majority made two explicit and glaring misstatements of law. First, it cited *Klapp* for the proposition that a finding of "ambiguity is a finding of last resort."[30] *Klapp* did not say this. Instead, *Klapp* held that the rule of contra proferentum[31] is a rule of last resort. Indeed, *Klapp* concluded that the language at issue in that case was ambiguous, without commenting on whether such a conclusion was a "good" or a "bad" thing.[32] Wholly absent from *Klapp*, or other Michigan law, is any indication that consideration of whether language is ambiguous should be given only as a last resort.

Second, I note that the *Lansing Mayor* majority expressly rejected the "reasonable minds" standard for discerning ambiguity as applied by the dissent in that case. The majority stated, "[t]hat is not, and has never been, the standard either for resolving cases or for ascertaining the existence of an ambiguity in the

---

[30] *Lansing Mayor*, *supra* at 165 n 6, citing *Klapp*, *supra* at 474.

[31] "Contra proferentum" is a rule of contract interpretation stating that ambiguities will be construed against the drafter of a contract. 2 Restatement Contracts, 2d, § 206, p 105.

[32] I reject the *Lansing Mayor* majority's implication that a finding of ambiguity is inherently a "bad" thing, as it is nothing more than an aid to statutory construction. See *Lansing Mayor*, *supra* at 165-166.

law."[33] However, the Court cited no authority for this proposition. In fact, this holding was a blatant misstatement of the law.[34]

Because it was based on a mythical definition of "ambiguity" and egregious misstatements of law, I reject *Lansing Mayor*'s standard for discerning statutory ambiguity.[35]

---

[33] *Id*. at 165-166.

[34] See part II(A)(2) of this opinion.

[35] Unable to cite caselaw in support of its definition of "ambiguity," the *Lansing Mayor* majority invented its own definition. This definition was premised on the majority's implication that a finding of ambiguity is a "bad" thing because it enables judges to use "presumptive 'rules of policy'" or "engage in a largely subjective and perambulatory reading of 'legislative history.'" *Lansing Mayor*, *supra* at 164-165. These approaches were disdained because they supposedly allowed judges to "substitut[e] their own policy preferences for those of the Legislature." *Id*. at 164.

However, the *Lansing Mayor* majority failed to acknowledge that its "plain meaning" approach to statutory interpretation is equally susceptible to subjective and arbitrary determinations of legislative intent. For example, such an approach may lead to the selection of one dictionary definition among many for a specific term. Lacking may be any sound explanation why the chosen definition was the one that the Legislature intended to use. See, e.g., *Liberty Hill Housing Corp v Livonia*, 480 Mich 44, 56-57; 746 NW2d 282 (2008) ("We conclude that the second meaning [out of six] is the one the Legislature intended."). Therefore, this approach is erroneous in the same way as is an approach that stretches to find ambiguity where none exists. I agree that it is inappropriate to inject policy considerations into the reading of an unambiguous statute.

i. Stare Decisis[36]

Because I conclude that *Lansing Mayor*'s definition of "ambiguous" is unsupported by Michigan law, I must now determine whether it ought to remain the controlling method for discerning ambiguity in the laws of this state. I treat the definition as governed by stare decisis for purposes of analysis.

Stare decisis is short for *stare decisis et non quieta movere*, which means "stand by the thing decided and do not disturb the calm." Stare decisis attempts to balance two competing considerations: the need of the community for stability in legal rules and decisions and the need of courts to correct past errors.[37] This

---

[36] I stated in my concurring opinion in *Fluor Enterprises v Dep't of Treasury*, 477 Mich 170; 730 NW2d 722 (2007), that tools of statutory interpretation, such as the definition of "ambiguity," are not "binding" in the same sense as is the holding in a case. Therefore, they are not entitled to the same level of deference, and stare decisis does not apply to them. However, *Lansing Mayor* purported to "hold" that its definition of "ambiguity" was the only applicable method for discerning statutory ambiguity. Furthermore, the *Lansing Mayor* majority explicitly stated in *Fluor* that "our current law [regarding ambiguity] is set forth in [*Lansing Mayor*]." *Fluor*, *supra* at 177 n 3. Perhaps for those reasons, this Court, as well as the Court of Appeals, has treated *Lansing Mayor*'s definition of "ambiguity" like any other binding precedent. See, e.g., *People v Gardner*, 482 Mich 41, 50; 753 NW2d 78 (2008); *Toll Northville, LTD v Northville*, 480 Mich 6, 15 n 2; 743 NW2d 902 (2008); *Batko v Batko*, 477 Mich 992; 725 NW2d 462 (2007) (Markman, J., dissenting); *Casco Twp v Secretary of State*, 472 Mich 566, 591; 701 NW2d 102 (2008); *Wayne Co v Wayne Co Retirement Comm*, 267 Mich App 230, 244; 704 NW2d 117 (2005). Although I disagree with that conclusion, I apply a stare decisis analysis to the *Lansing Mayor* definition of "ambiguity" for purposes of analysis.

[37] Am Jur, Courts, § 131.

14

doctrine has been part of the American legal landscape since the country's formation.[38]

Alexander Hamilton wrote that, to "avoid an arbitrary discretion in the courts, it is indispensable that [courts] should be bound down by strict rules and precedents which serve to define and point out their duty in every particular case that comes before them . . . ."[39] In the early twentieth century, Justice (then-Judge) Cardozo wrote that the "labor of judges would be increased almost to the breaking point if every past decision could be reopened in every case, and one could not lay one's own course of bricks on the secure foundation of the courses laid by others who had gone before him."[40]

Although any rule is only as solid as its boundaries are clear, it was not until recently that this Court formally established a test to determine when it should depart from stare decisis. In 2000, in *Robinson v Detroit*,[41] the Court held that the first question in deciding whether to overrule precedent is whether an earlier decision was wrongly decided.[42] Next, according to *Robinson*, courts

---

[38] The doctrine can be traced back to medieval England. Healy, *Stare decisis as a constitutional requirement*, 104 W Va L R 43, 56-62 (2001).

[39] The Federalist No. 78, p 471 (Alexander Hamilton) (Clinton Rossiter ed, 1961).

[40] Benjamin N. Cardozo, *The Nature of the Judicial Process* (New Haven: Yale University Press, 1921), p 149.

[41] *Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000).

[42] *Id*. at 464.

should review (1) whether the decision defies practical workability, (2) whether reliance interests would work an undue hardship if the decision were overturned, and (3) whether changes in the law or facts no longer justify the decision.[43] Thus, *Robinson* enunciated a test premised on whether the questioned decision was wrongly decided, to be followed by a three-pronged analysis of whether stare decisis nonetheless counsels upholding it.

Although the *Robinson* test was implemented as a mechanism for determining when a prior decision of the Court should be upheld, its application has proven superficial and cursory.[44] In fact, an examination of cases applying the *Robinson* test demonstrates that *not once* has the Court cited it as a basis for upholding a prior decision.[45] *Robinson*'s statement that a wrongly decided case

---

[43] *Id.*

[44] See, e.g., *Paige v Sterling Hts*, 476 Mich 495, 513; 720 NW2d 219 (2006) ("we need not consider whether changes in the law and facts no longer justify [the precedent] because [the precedent] itself was never justified."); *People v Hickman*, 470 Mich 602, 610 n 6; 684 NW2d 267 (2004), and *Mack v Detroit*, 467 Mich 186, 203 n 19; 649 NW2d 47 (2002) (citing *Robinson* only as an afterthought in a footnote).

[45] See, e.g., *Gardner*, *supra* at 61; *People v Ream*, 481 Mich 223, 240; 750 NW2d 536 (2008); *People v Barrett*, 480 Mich 125, 138; 747 NW2d 797 (2008); *Trentadue v Buckler Lawn Sprinkler*, 479 Mich 378, 393; 738 NW2d 664 (2007); *Renny v Dep't of Transportation*, 478 Mich 490, 503; 734 NW2d 518 (2007); *People v Smith*, 478 Mich 292, 315; 733 NW2d 351 (2007); *Karaczewski v Farbman Stein & Co*, 478 Mich 28, 38; 732 NW2d 56 (2007); *Al-Shimmari v Detroit Med Ctr*, 477 Mich 280, 297; 731 NW2d 29 (2007); *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 214; 731 NW2d 41 (2007); *Haynes v Neshewat*, 477 Mich 29, 39; 729 NW2d 488 (2007); *Paige*, *supra* at 510; *Grimes v Dep't of Transportation*, 475 Mich 72, 87; 715 NW2d 275 (2006); *People v*

16

should "invariably" be overruled was a chilling signal that a conclusion that precedent has been wrongly decided is sufficient justification for overruling it.[46]

These facts alone suffice to show that *Robinson* is insufficiently respectful of precedent. Therefore, I would modify it by shifting the balance back in favor of precedent and expanding on *Robinson*'s list of factors to consider in applying stare decisis.

I would hold that a stare decisis analysis should always begin with the presumption that upholding the precedent involved is the preferred course of action. The presumption should be retained until effectively rebutted by the conclusion that a compelling justification exists to overturn the precedent.

*Robinson*, by contrast, contained no such presumption. Moreover, the Court's applications of *Robinson* suggest that such a presumption was never

*Hawthorne*, 474 Mich 174, 183; 713 NW2d 724 (2006); *Devillers v Auto Club Ins Ass'n*, 473 Mich 562, 584; 702 NW2d 539 (2005); *People v Schaefer*, 473 Mich 418, 434; 703 NW2d 774 (2005); *People v Starks*, 473 Mich 227, 236; 701 NW2d 136 (2005); *Garg v Macomb Mental Health*, 472 Mich 263, 285; 696 NW2d 646 (2005); *People v Davis*, 472 Mich 156, 169; 695 NW2d 45 (2005); *Neal v Wilkes*, 470 Mich 661, 667; 685 NW2d 648 (2004); *Hickman, supra* at 610; *People v Lively*, 470 Mich 248, 256; 680 NW2d 878 (2004); *People v Moore*, 470 Mich 56, 69; 679 NW2d 41 (2004); *Hayne v Dep't of State Police*, 468 Mich 302, 314; 664 NW2d 129 (2003); *Mack, supra* at 203; *Sington v Chrysler Corp*, 467 Mich 144, 161; 648 NW2d 624 (2002); *People v Petit*, 466 Mich 624, 633; 648 NW2d 193 (2002); *People v Cornell*, 466 Mich 335, 358; 646 NW2d 127 (2002); *Robertson v Daimler Chrysler Corp*, 465 Mich 732, 756; 641 NW2d 567 (2002); *Pohutski v City of Allen Park*, 465 Mich 675, 693; 641 NW2d 219 (2002); *Nawrocki v Macomb Co Rd Comm*, 463 Mich 143, 158; 615 NW2d 702 (2000); *Mudel v Great Atlantic & Pacific Tea Co*, 462 Mich 691, 708; 614 NW2d 607 (2000).

[46] *Robinson, supra* at 465.

considered. Even if it had been initially applied, once a case was deemed to have been wrongly decided, any presumption in favor of upholding precedent disappeared.[47] I would reject this approach and reiterate that a rebuttable presumption exists in favor of upholding precedent.[48]

The question arises what deference should be paid to cases in which *Robinson* was used to overturn existing precedent. I believe that a lower level of deference should be accorded to these cases because they represent a departure from the traditional notions of stare decisis. In *Adarand Constructors, Inc v Pena*,[49] the United States Supreme Court expressly addressed the distinction between consideration of well established law and cases representing a recent departure from precedent:

> It is worth pointing out the difference between the applications of *stare decisis* in this case and in *Planned Parenthood*

---

[47] See, e.g., *Paige*, *supra* at 512 n 21 ("the only instances in which we *might decline* to overrule [erroneous precedent] . . . is when it would produce chaos.") (emphasis added); *Hickman*, *supra* at 610 n 6 (noting that no special justification is necessary to overrule erroneous precedent); *People v Nutt*, 469 Mich 565, 575, 591; 677 NW2d 1 (2004) (concluding that the court is *compelled* to overrule erroneous precedent); *Petit*, *supra* at 633-34 (stating that courts *should* overturn erroneous decisions).

[48] I recognize and agree with *Robinson* that stare decisis is "not to be applied mechanically to forever prevent the Court from overruling earlier erroneous decisions," nor is it "an inexorable command." *Robinson*, *supra* at 463-464. However, I again note that, if our stare decisis analysis leads to the Court overruling precedent *every time it is applied*, stare decisis becomes not an "inexorable command," but rather a meaningless exercise.

[49] *Adarand Constructors, Inc v Pena*, 515 US 200; 115 S Ct 2097; 132 L Ed 2d 158 (1995).

*of Southeastern Pa v Casey. Casey* explained how considerations of *stare decisis* inform the decision whether to overrule a long-established precedent that has become integrated into the fabric of the law. Overruling precedent of that kind naturally may have consequences for "the ideal of the rule of law." In addition, such precedent is likely to have engendered substantial reliance, as was true in *Casey* itself. ("[F]or two decades of economic and social developments, people have organized intimate relationships and made choices that define their views of themselves and their places in society, in reliance on the availability of abortion in the event that contraception should fail."). But in this case, as we have explained, we do not face a precedent of that kind, because *Metro Broadcasting* itself *departed* from our prior cases—and did so quite recently. By refusing to follow *Metro Broadcasting,* then, we do not depart from the fabric of the law; we restore it. We also note that reliance on a case that has recently departed from precedent is likely to be minimal, particularly where, as here, the rule set forth in that case is unlikely to affect primary conduct in any event.[50]

Furthermore, the Court stated:

Our past practice in similar situations supports our action today. In *United States v Dixon*, we overruled the recent case of *Grady v Corbin*, because *Grady* "lack[ed] constitutional roots" and was "wholly inconsistent with earlier Supreme Court precedent." In *Solorio v United States*, we overruled *O'Callahan v Parker*, which had caused "confusion" and had rejected "an unbroken line of decisions from 1866 to 1960." And in *Continental TV, Inc v GTE Sylvania Inc,* we overruled *United States v Arnold, Schwinn & Co,* which was "an abrupt and largely unexplained departure" from precedent, and of which "[t]he great weight of scholarly opinion ha[d] been critical." See also, *e.g., Payne v Tennessee* (overruling *Booth v Maryland,* and *South Carolina v Gathers*; *Monell v New York City Dept of Social Servs* (partially overruling *Monroe v Pape,* because *Monroe* was a "departure from prior practice" that had not engendered substantial reliance); *Swift & Co v Wickham* (overruling *Kesler v Department of Public Safety of Utah,* to reaffirm "pre-

---

[50] *Id*. at 233-234 (citations altered or omitted).

19

*Kesler* precedent" and restore the law to the "view . . . which this Court has traditionally taken" in older cases).[51]

Thus, there is substantial support for applying a decreased presumption in favor of precedent when that precedent itself represents a recent departure from prior established caselaw.[52]

The next inquiry should be whether there exists a compelling justification for overruling precedent.[53] A compelling justification is *not* a mere belief that a precedential case was wrongly decided or that the Court, as currently composed, would have decided the case differently. Rather, in determining whether a

---

[51] *Id.* at 232-233 (citations altered or omitted).

[52] Other United States Supreme Court decisions also implicitly acknowledge that precedent that itself overruled recent precedent is entitled to a reduced presumption. See, e.g., *Randall v Sorrell*, 548 US 230, 244; 126 S Ct 2479; 165 L Ed 2d 482 (2006) (stating that precedent should only be overruled in exceptional cases, and that "[t]his is especially true where, as here, the principle has become settled through *iteration and reiteration over a long period of time*.") (emphasis added); *United States v IBM*, 517 US 843, 856; 116 S Ct 1793; 135 L Ed 2d 124 (1996) (the Court declined to overrule a case because it had "been controlling precedent *for over 80 years*.") (emphasis added); *Welch v Texas Dep't of Highways and Pub Transportation*, 483 US 468, 493-494; 107 S Ct 2941; 97 L Ed 2d 389 (1987) (declining to overrule precedent that had "been adhered to without exception by this Court *for almost a century*") (emphasis added); and *CBOCS West, Inc v Humphries*, ___ US ___; 128 S Ct 1951, 1958; 170 L Ed 2d 864 (2008) (declining to overturn "the well-embedded interpretation" of the statute at issue).

[53] Requiring a compelling justification to overrule precedent is consistent not only with most other jurisdictions, but also with United States Supreme Court precedent. See, e.g., *Planned Parenthood v Casey*, 505 US 833, 864; 112 S Ct 2791; 120 L Ed 2d 674 (1992).

20

compelling justification exists, the Court should consider several evaluative criteria, none of which, standing alone, is dispositive.

These criteria include, but are not limited to: (1) whether the rule has proven to be intolerable because it defies practical workability, (2) whether reliance on the rule is such that overruling it would cause a special hardship and inequity, (3) whether related principles of law have so far developed since the rule was pronounced that no more than a remnant of the rule has survived, (4) whether facts and circumstances have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification, (5) whether other jurisdictions have decided similar issues in a different manner, (6) whether upholding the rule is likely to result in serious detriment prejudicial to public interests, and (7) whether the prior decision was an abrupt and largely unexplained departure from precedent.

Not all of these factors will be applicable in every case. Nor is there a magic number of factors that must favor overruling a case in order to establish the requisite compelling justification. Rather, I believe that the conclusion about whether these factors support finding a compelling justification should be reached on a case-by-case basis.

ii. Application of stare decisis to *Lansing Mayor*

As stated above, I begin my stare decisis analysis with a presumption in favor of upholding precedent. Only if a compelling justification exists should the

Court overrule the prior decision. Although *Lansing Mayor* was wrongly decided with respect to the definition of ambiguity, this fact does not constitute the requisite compelling justification to overrule it. Instead, we must examine additional factors to determine whether there exists a compelling justification to overrule it.

First, I consider whether the method for discerning ambiguity in *Lansing Mayor* has proven intolerable because it defies practical workability. I believe that it does. Intrinsically, an analytical approach to interpreting statutes on the basis of their "plain meaning," where reasonable minds disagree on what that meaning is, is unworkable. This standard gives judges unfettered discretion to pick and choose among available "plain meanings" or dictionary definitions, and thus sheds little light on what the Legislature intended statutory language to mean.[54] It also potentially leads to arbitrary outcomes and injects instability into the law.

Moreover, the mere fact that different justices of this Court, judges of the Court of Appeals, and trial judges disagree on the meaning of statutory language suggests that ambiguity exists. Allowing a judge to pick one meaning among several equally plausible meanings without using the rules of statutory construction is quite simply an exercise in speculation. As Justice Stevens of the United States Supreme Court stated:

---

[54] See, e.g., *Fluor, supra* at 189 n 4 (Kelly, J., concurring) ("It is a bizarre notion that the language of a statute can have only one reasonable meaning when four separate independent entities have split on its correct interpretation.").

22

> [T]he "minimalist" judge who holds that the purpose of [a] statute may be learned only from its language retains greater discretion than the judge who will seek guidance from every reliable source. A method of statutory interpretation that is deliberately uninformed, and hence unconstrained, increases the risk that the judge's own policy preferences will affect the decisional process.[55]

I share Justice Stevens's concerns and believe that *Lansing Mayor*'s definition of "ambiguity" is inherently unworkable.

I also note that application of *Lansing Mayor*'s definition of "ambiguity" has never once led the Court to find statutory language ambiguous.[56] If a rule of

---

[55] *BedRoc Ltd, LLC v United States*, 541 US 176, 192; 124 S Ct 1587 (2004) (Stevens, J., dissenting) (citations and quotation marks omitted).

[56] See, e.g. *Dimmit & Owens Fin, Inc v Deloitte & Touche*, 481 Mich 618; 752 NW2d 37 (2008); *Ross v Blue Care Network*, 480 Mich 153; 747 NW2d 828 (2008); *Wesche v Mecosta Co Rd Comm*, 480 Mich 75; 746 NW2d 847 (2008); *Ernsting v Ave Maria College*, 480 Mich 985 (2007); *Trentadue v Buckler Lawn Sprinkler*, 479 Mich 378; 738 NW2d 664 (2007); *Lash v Traverse City*, 479 Mich 180; 735 NW2d 628 (2007); *Brown, supra*; *Renny v Dep't of Transportation*, 478 Mich 490; 734 NW2d 518 (2007); *South Haven v Van Buren Co Bd of Comm'rs*, 478 Mich 518; 734 NW2d 533 (2007); *Omdahl v West Iron Co Bd of Ed*, 478 Mich 423; 733 NW2d 380 (2007); *Bukowski v Detroit*, 478 Mich 268; 732 NW2d 75 (2007); *Karaczewski, supra*; *Fluor, supra*; *Rowland, supra*; *People v Peals*, 476 Mich 636; 720 NW2d 196 (2006); *Paige, supra*; *Cameron v Auto Club Ins Ass'n*, 476 Mich 55; 718 NW2d 784 (2006); *Ford Motor Co v Woodhaven*, 475 Mich 425; 716 NW2d 247 (2006); *People v Derror*, 475 Mich 316; 715 NW2d 822 (2006); *People v Williams*, 475 Mich 245; 716 NW2d 208 (2006); *People v Yamat*, 475 Mich 49; 714 NW2d 335 (2006); *Grimes, supra*; *Michigan v Monaco*, 474 Mich 48; 710 NW2d 46 (2006); *Ostroth v Warren Regency, GP, LLC*, 474 Mich 36; 709 NW2d 589 (2006); *Co Rd Ass'n v Governor*, 474 Mich 11; 705 NW2d 680 (2005); *Devillers, supra*; *Reed v Yackell*, 473 Mich 520; 703 NW2d 1 (2005); *Ayar v Foodland Distributors*, 472 Mich 713; 698 NW2d 875 (2005); *Casco Twp, supra*; *Elezovic v Ford Motor Co*, 472 Mich 408; 697 NW2d 851 (2005); *Jarrad v Integon Nat'l Ins Co*, 472 Mich 207; 696 NW2d 621 (2005); *Roberts v Atkins*, 470 Mich 679; 684 NW2d 711 (2004); *Neal, supra*; *People v*

statutory interpretation inevitably leads to the same result in each case in which it is applied, such a rule is innately unworkable. Accordingly, this factor weighs strongly in favor of abrogating the *Lansing Mayor* definition.

Second, I examine whether reliance on the rule is such that overruling it would cause a special hardship and inequity. I believe that litigants have reasonably relied on *Lansing Mayor*'s definition of "ambiguity."[57] Its application potentially leads to a different statutory interpretation than one based on alternative definitions. Hence, I conclude that rejecting the definition may prejudice current litigants who have relied on it.

However, I also recognize that litigants have continued to rely on previous standards for discerning ambiguity. This reliance is also reasonable given the inconsistent application of *Lansing Mayor*'s definition,[58] as well as the

---

*Barbee*, 470 Mich 283; 681 NW2d 348 (2004); *Lively*, *supra*; *People v Laney*, 470 Mich 267; 680 NW2d 888 (2004); *Lansing Mayor*, *supra*.

[57] A review of filings in this Court and lower courts demonstrates that in post-2004 cases involving statutory interpretation, litigants often cite *Lansing Mayor* for the applicable definition of "ambiguity."

[58] Compare, e.g., *Kinder Morgan Michigan, LLC v City of Jackson*, 277 Mich App 159, 163-164; 744 NW2d 184 (2007) ("[W]hen a statute is ambiguous on its face and reasonable minds can differ with respect to its meaning, judicial construction is necessary to determine the intent of the Legislature."), with *Village of Holly v Holly Twp*, 267 Mich App 461, 474; 705 NW2d 532 (2005) ("Although reasonable minds may differ on the interpretation of subsection 3, that is not the test to determine whether a statutory ambiguity justifies judicial construction . . . [r]ather, a provision of the law is ambiguous only if it 'irreconcilably confict[s]' with another provision . . . or when it is *equally* susceptible to more than a single meaning.") (citations omitted).

24

disagreement over the proper definition of "ambiguity" among the justices of this Court.[59] Such reliance is not surprising given that *Lansing Mayor*'s definition is so vastly different from the definitions of ambiguity that preceded it for more than 150 years.[60] In fact, despite its explicit holding, *Lansing Mayor* did not overrule or cite *any* previous cases that addressed the proper method for discerning ambiguity.

Nevertheless, because *Lansing Mayor* stands as the most recent declaration of how to discern statutory ambiguity, litigants reasonably relied on it for this point. I therefore conclude that this factor weighs moderately in favor of upholding the definition.

Third, I consider whether related principles of law have so far developed since the *Lansing Mayor* definition of "ambiguity" was pronounced that only a remnant of the definition has survived. This factor is inapplicable to the stare decisis analysis in this case. The definition of "ambiguity" is a tool of judicial

---

As the United States Supreme Court stated in *Pearson v Callahan*, ___ US ___; 129 S Ct 808, 818; 172 L Ed 2d 565 (2009), "[w]here a decision has been questioned by members of this Court in later decisions and has defied consistent application by the lower courts, these factors weigh in favor of reconsideration." (internal quotation marks and punctuation omitted). Thus, despite reliance on the new and old definitions of "ambiguity," it is noteworthy that the United States Supreme Court has held that inconsistent application of a new rule favors reexamination of that rule.

[59] See *Stone v Williamson*, 482 Mich 144, 152, 173 and n 4; 753 NW2d 106 (2008).

[60] See, e.g., *Bidwell v Whitaker*, 1 Mich 469 (1850).

25

construction. Its only relevance is to discern ambiguity or the lack of it in a given statute. Thus, the definition of "ambiguity" stands alone and is not inherently related to other principles of law. Accordingly, this factor neither weighs in favor of nor against replacing the *Lansing Mayor* definition.

Fourth, I examine whether facts and circumstances have so changed, or have come to be seen so differently, as to rob the old definition of significant justification. This factor focuses on real-world practicalities.[61] However, the definition of "ambiguity" is not beholden to the underlying facts and circumstances of a given case. Accordingly, because the definition of "ambiguity" does not implicate practical concerns, I do not believe that this factor weighs in favor of or against replacing the *Lansing Mayor* definition.

Fifth, I consider whether other jurisdictions have decided similar issues in a different manner. My review indicates that *Lansing Mayor*'s definition of "ambiguity" is unsupported by any other jurisdiction. In fact, not a single jurisdiction, state or federal, requires an irreconcilable conflict between provisions or that language be equally susceptible to more than one meaning before finding

---

[61] See, e.g., *Casey*, *supra* at 860 (discussing how advancements in medical treatment since *Roe v Wade*, 410 US 113; 93 S Ct 705; 35 L Ed 2d 147 (1972), was decided have not rendered the "factual underpinnings" of *Roe*'s central holding obsolete).

statutory ambiguity.[62]  Accordingly, this factor weighs strongly in favor of rejecting the *Lansing Mayor* definition.

I note that the sixth factor, whether upholding the *Lansing Mayor* definition is likely to result in serious detriment prejudicial to public interests, has no bearing on this case.  As previously stated, the definition of "ambiguity" is merely a tool of statutory interpretation.  As such, its application has no relevance to public interests because the definition of "ambiguity," standing alone, does not dictate any course of action in a particular case.

Finally, I consider whether the prior decision was an abrupt and largely unexplained departure from precedent.  As noted earlier, *Lansing Mayor*'s definition of ambiguity is nothing more than a legal fiction, wholly unsupported by *any* law.  Furthermore, it represented a decisive and abrupt shift from precedent without recognition of the prior standards for discerning statutory ambiguity.  Accordingly, this factor weighs heavily in favor of abrogating *Lansing Mayor*'s definition of ambiguity.

Under my analysis of the aforementioned factors, *Lansing Mayor*'s definition of "ambiguity" has proven unworkable, is unsupported by other jurisdictions, and represents an abrupt and unexplained departure from precedent.  Although it has been relied on in Michigan, reliance has been uneven and short-

---

[62] See *post* at 31.

27

lived.  Accordingly, I conclude that a compelling justification exists for replacing it.[63]

---

[63] Justice Markman has criticized my stare decisis analysis.  I offer the following response.

(1) As I state *supra* at 14 n 36, I continue to believe that tools of statutory interpretation, such as the definition of "ambiguity," are not entitled to stare decisis status.  However, Justice Markman, other members of this Court, the Court of Appeals, and lower courts have treated *Lansing Mayor*'s definition of "ambiguity" as fully entitled to it.  See *id*.  Hence, a thorough analysis of that case's definition of ambiguity and its precedential worth is appropriate, even if not mandated.

(2) My fealty to stare decisis speaks for itself.  As evidenced by this opinion, only because I find that, after a thorough examination of the relevant factors, a compelling justification exists for overruling precedent do I do so.  This stands in stark contrast to the former majority's approach to stare decisis, as shown *supra* at notes 44 and 47.

(3) Justice Markman claims that "when the previous majority overruled a precedent, it was to ensure that the decisions of this Court more closely reflected the judgments of the people's elected representatives."  *Post* at 46.  This is simply a reflection of his personal opinion and that of the justices who shared his view in those cases.  As indicated earlier, the former majority's overrulings showed little respect for the doctrine of stare decisis and developed a superficial rule in *Robinson* to deal with it.  They disdained longstanding cases that had stood for many years before the former majority's ascension to the bench.

(4) Contrary to Justice Markman's contention, I have not ignored precedent in any of the cases to which he cites.  For a comprehensive response to Justice Markman on this issue, see my concurring opinion in *Potter v McLeary*, ___ Mich ___; ___ NW2d ___ (2009), decided July 31, 2009 (Docket No. 136336).

(5) Justice Markman claims that I have never joined an opinion that articulates a "compelling justification" for upholding a prior decision that I believe was wrongly decided.  This comes as no surprise, however.  The finding of a compelling justification as a requisite to overruling precedent has *never* been the standard in Michigan during my years as a justice.  *Robinson* did not require a compelling justification to overrule precedent.

## 2. *The Proper Method of Discerning Ambiguity*

Having rejected the *Lansing Mayor* definition of "ambiguity," I now iterate the proper method of discerning statutory ambiguity. Before *Lansing Mayor* was decided, Michigan courts used several analogous variations of statutory interpretation. For example, in *In re MCI Telecom Complaint*,[64] we held that "[s]hould a statute be ambiguous on its face . . . so that reasonable minds could differ with respect to its meaning, judicial construction is appropriate to determine the meaning."[65] This Court has applied the "reasonable minds" standard on numerous other occasions.[66]

---

(6) Justice Markman's claim that I "find[] it necessary to depart from the 150-year old standard [regarding stare decisis] that [I] previously hailed . . ." is hopelessly off the mark. Justice Markman *himself* joined the Court's opinion in *Robinson*, which established an unprecedented test for evaluating prior decisions of the Court. Although I objected to it, I followed *Robinson* in subsequent cases. See, e.g., *Perry v Golling Chrysler Plymouth Jeep, Inc*, 477 Mich 62, 71; 729 NW2d 500 (2007) (Kelly, J., dissenting). Moreover, my position in *Rowland*, *supra*, is entirely consistent with this opinion. As I stated in *Rowland*, "the doctrine [of stare decisis] carries such persuasive force that we have always required a departure from precedent to be supported by some special justification." 477 Mich at 253-254, citing *United States v IBM*, *supra*. Only now do I expand upon *Robinson* and define the boundaries of a "compelling justification" because of *Robinson's* insufficient deference to precedent.

[64] *In re MCI Telecom Complaint*, 460 Mich 396; 596 NW2d 164 (1999).

[65] *Id*. at 411-412. Justice Cavanagh authored the opinion in *In re MCI*. Also signing it were then-Chief Justice Weaver and Justices Corrigan, Taylor, Brickley, and myself. Justice Young did not participate in the case.

[66] See, e.g. *People v Petty*, 469 Mich 108, 114; 665 NW2d 443 (2003); *People v Warren*, 462 Mich 415, 427; 615 NW2d 691 (2000); *Yaldo v North Pointe Ins Co*, 457 Mich 341, 347; 578 NW2d 274 (1998); *Sam v Balardo*, 411 Mich 405, 418-419 n 9; 308 NW2d 142 (1981). *Petty*, authored by Justice

29

This Court has also employed a "doubtful" standard in deciding whether ambiguity exists. In *Smith v Grand Rapids City Comm*,[67] we held that "[w]here . . . the language of a statute is of doubtful meaning, the court should give it a reasonable construction looking to the purpose to be subserved thereby, and the object sought to be accomplished and its occasion and necessity."[68]

Finally, this Court has used a "susceptible" standard. Applying this method of interpretation, we held that "[i]t is only where a statute is unclear and susceptible to more than one interpretation that judicial construction is allowed."[69] These corresponding approaches to evaluating statutes for ambiguity have endured in Michigan caselaw throughout the nineteenth and twentieth centuries.[70]

These historical standards for discerning ambiguity are easily reconcilable and analogous. The crux of the "reasonable minds" standard is that, when two

---

Cavanagh, was notably signed by then-Chief Justice Corrigan and Justices Weaver, Taylor, Young, Markman, and myself. Yet Justices Taylor, Corrigan, Young, and Markman apparently chose to ignore *Petty* and the "reasonable minds" standard in *Lansing Mayor* and its progeny applying *Lansing Mayor*'s aberrant definition of "ambiguity."

[67] *Smith v Grand Rapids City Comm*, 281 Mich 235; 274 NW 776 (1934).

[68] *Id*. at 240-241 (citations omitted).

[69] *People v Morris*, 450 Mich 316, 326; 537 NW2d 842 (1995).

[70] See, e.g., *In re MCI Telecom Complaint*, *supra*; *Sam*, *supra*; *City of Lansing v Lansing Twp*, 356 Mich 641; 97 NW2d 804 (1959); *People v Detroit, GH & M R Co*, 228 Mich 596; 200 NW 536 (1924); *Crary*, *supra*; *Borden v Fletcher's Estate*, 131 Mich 220; 91 NW 145 (1902); *Lane v Ruhl*, 103 Mich 38; 61 NW 347 (1894); *Bidwell*, *supra*.

persons reasonably afford different meanings to statutory language, it is ambiguous. As for the "doubtful" standard, it suggests that a statute is ambiguous when its language is of questionable or unclear meaning. The "susceptible" standard is self-explanatory in that, if a statute is susceptible to more than one interpretation, it is ambiguous.

I adopt a definition of "ambiguity" that encompasses all three of the aforementioned well-established standards for determining ambiguity.[71] Specifically, I would hold:

> [W]hen there can be reasonable disagreement over a statute's meaning, or, as others have put it, when a statute is capable of being understood by reasonably well-informed persons in two or more different senses, [a] statute is ambiguous. For example, this Court has concluded that statutes [are] ambiguous when one word in the

---

[71] Justice Markman claims that "[a] facile resort to ambiguity affords the judge a readily-available means of acting beyond the scope of his or her authority to exercise exclusively the 'judicial power.'" *Post* at 19. It seems obvious that the "judicial power" must include the authority to interpret statutes as written and interpret ambiguity where appropriate. Also, misuse of our "judicial power" can certainly occur where ambiguity is never found and judges use few judicial tools to discern what they believe to be plain language.

Moreover, Justice Markman questions "what . . . arguments [I] have for substantially expanding the range of judicial decision-making . . . ." *Post* at 30. I do not need an "argument," however, to defend my definition of ambiguity, as it is supported by a multitude of cases in *every* state and *every* federal jurisdiction. See *infra*, notes 73, 74 and 75. To the contrary, it is Justice Markman who fails to advance any justification for the definition of ambiguity that he favors. As indicated earlier, that definition was based not on *any* precedent whatsoever, but rather derived from thin air. While he passionately decries that his definition is "fair," *post* at 33, and "grounded in logic and common sense," *post* at 28, whether a legal principle is "fair" or "logical" is highly subjective. Its fairness comes into serious question when it has no basis in the law.

statute has an unclear meaning, when a statute's interaction with another statute has rendered its meaning unclear, or when application of the statute to facts has rendered the correct application of the statute uncertain.[72]

This standard gleans the fundamental principles from the "reasonable minds," "doubtful," and "susceptible" tests. It has been applied, in some variation, by every other state in the country,[73] all the federal circuit courts,[74] and by the United States Supreme Court.[75]

---

[72] *Yellow Freight System, Inc v State*, 464 Mich 21, 38; 627 NW2d 236 (2001) (Cavanagh, J., dissenting) (citations omitted), rev'd *Yellow Transp Inc v Michigan*, 537 US 36 (2002).

[73] See, e.g., *AmSouth Bank v Holberg*, 789 So 2d 833 (Ala, 2001); *Alaska v Saathoff*, 29 P3d 236 (Alas, 2001); *State v Gomez*, 212 Ariz 55; 127 P3d 873 (2006); *Yamaha Motor Corp, USA v Richard's Honda Yamaha*, 344 Ark 44; 38 SW3d 356 (2001); *Hughes v Bd of Architectural Exam'rs*, 17 Cal 4th 763; 72 Cal Rptr 2d 624; 952 P2d 641 (1998); *Colorado v Nieto*, 993 P2d 493 (Colo, 2000); *State v Marsh & McLennan Companies, Inc*, 286 Conn 454; 944 A2d 315 (2008); *LeVan v Independence Mall, Inc*, 940 A2d 929 (Del, 2007); *State v Huggins*, 802 So 2d 276, 277 (2001); *Aldrich v City of Lumber City*, 273 Ga 461, 542 SE2d 102 (2001); *Barnett v Hawaii*, 91 Hawai'i 20, 979 P2d 1046 (1999); *State v Yzaguirre*, 144 Idaho 471; 163 P3d 1183 (2007); *In re BC*, 176 Ill 2d 536; 680 NE2d 1355 (1997); *In re Lehman*, 690 NE2d 696; 702 (Ind, 1997); *City of Waterloo v Bainbridge* 749 NW2d 245 (2008); *State v Paul*, 285 Kan 658; 175 P3d 840 (Iowa, 2008); *Revenue Cabinet v Rohm & Haas Ky Inc*, 929 SW2d 741 (Ky App, 1996); *Burnette v Stalder*, 789 So 2d 573 (La, 2001); *In re Estate of Kingsbury*, 946 A2d 389 (Me, 2008); *Twine v State*, 395 Md 539; 910 A2d 1132 (2006); *Town of Falmouth v Civil Serv Comm*, 447 Mass 814; 857 NE2d 1052 (2006); *Amaral v Saint Cloud Hosp*, 598 NW2d 379 (Minn, 1999); *Dawson v Townsend & Sons, Inc*, 735 So 2d 1131 (Miss App, 1999); *State v Graham*, 204 SW3d 655 (Mo, 2006); *Montana Contractors Ass'n, Inc v Dep't of Highways*, 220 Mont 392; 715 P2d 1056 (1986); *State ex rel Johnson v Marsh*, 149 Neb 1; 29 NW2d 799 (1947); *Chanos v Nevada Tax Comm*, 181 P3d 675 (Nev, 2008); *In re Baker*, 154 NH 186; 908 A2d 806 (2006); *Fairway Dodge, LLC v Decker Dodge, Inc*, 191 NJ 460; 924 A2d 517 (2007); *Maestas v Zager*, 141 NM 154; 152 P3d 141 (2007); *Charter Dev Co v City of Buffalo*, 6 NY3d 578; 815 NY Supp 2d 13; 848 NE2d 460

B. Application to § 315(1)

I believe that § 315(1) is ambiguous because the statute is capable of being understood by reasonably well-informed persons in two or more different senses. As mentioned before, the term "prorate" could reasonably be understood to apply to employers, their insurance providers, health care providers, and to employees

(2006); *Morris v Thomas*, 161 NC App 680; 589 SE2d 419 (2003); *Walberg v Walberg*, 748 NW2d 702 (ND, 2008); *Clark v Scarpelli*, 91 Ohio St 3d 271; 744 NE2d 719 (2001); *YDF, Inc v Schlumar, Inc*, 136 P3d 656 (Okla, 2006); *State v Cooper*, 319 Or 162; 874 P2d 822 (1994); *Pridgen v Parker Hannifin Corp*, 588 Pa 405; 905 A2d 422 (2006); *Unistrut Corp v RI Dept of Labor & Training*, 922 A2d 93 (RI, 2007); *Kennedy v South Carolina Retirement Sys*, 345 SC 339, 549 SE2d 243 (2001); *Zoss v Schaefers*, 598 NW2d 550 (SD, 1999); *Sallee v Barrett*, 171 SW3d 822 (Tenn, 2005); *In re Missouri P R Co*, 998 SW2d 212 (Tex, 1999); *Martinez v Media-Paymaster Plus/Church of Jesus Christ of Latter-Day Saints*, 164 P3d 384 (Utah, 2007); *Green Mountain Power Corp v Sprint Communications*, 172 Vt 416; 779 A2d 687 (2001); *Brown v Lukhard*, 229 Va 316; 330 SE2d 84 (1985); *Yakima v Int'l Ass'n of Fire Fighters*, 117 Wash 2d 655; 818 P2d 1076 (1991); *Phillips v Larrys Drive-In Pharmacy, Inc*, 220 W Va 484; 647 SE2d 920 (2007); *State v Williams*, 198 Wis 2d 479; 544 NW2d 400 (1996); *Story v Wyoming*, 755 P2d 228 (1988).

[74] See, e.g., *United States v O'Neil*, 11 F3d 292, 297-298 (CA 1, 1993); *Natural Resources Defense Council v Muszynski*, 268 F3d 91, 98 (CA 2, 2001); *Dobrek v Phelan*, 419 F3d 259, 264 (CA 3, 2005); *Newport News Shipbuilding & Dry Dock Co v Brown*, 376 F3d 245, 248 (CA 4, 2004); *United States v Lowe*, 118 F3d 399, 402 (CA 5, 1997); *Saxion v Titan-C-Mfg Inc*, 86 F3d 553, 560 (CA 6, 1996); *Williams v Banning*, 72 F3d 552, 554 (CA 7, 1995); *Design Profesionals Ins Co v Chi Ins Co*, 454 F3d 906, 910 (CA 8, 2006); *Mt Adams Veneer Co v United States*, 896 F2d 339, 342 (CA 9, 1990); *Wright v Fed Bureau of Prisons*, 451 F3d 1231, 1235 (CA 10, 2006); *Medical Transportation Mgmt Corp v Comm'r of Internal Revenue Service*, 506 F3d 1364, 1368 (CA 11, 2007); *United States v Villanueva-Sotelo*, 380 US App DC 11, 515 F3d 1234, 1237 (2008); *Butterbaugh v Dep't of Justice*, 336 F3d 1332, 1339 (CA Fed, 2003).

[75] See, e.g., *Gonzales v Oregon*, 546 US 243, 258; 126 S Ct 904; 163 L Ed 2d 748 (2006); *Houghton v Payne*, 194 US 88, 99; 24 S Ct 590; 48 L Ed 888 (1904).

seeking workers' compensation benefits. Indeed, § 315 and the entire WDCA are entirely silent as to who, among these parties, is subject to a proration of attorney fees. Absent extra-textual sources, any determination of the Legislature's intent becomes a mere exercise in speculation. Thus, having found that § 315(1) is ambiguous, I may now look to extra-textual sources to aid in its interpretation.[76]

### 1. Harmonization with the WDCA

I seek an interpretation of § 315(1) that is in accord with the principles underlying the WDCA as a whole. The act is remedial in nature.[77] Thus, where ambiguity exists and judicial construction of the act is necessary, we construe the act's terms liberally to grant rather than deny benefits to injured workers.[78] This canon of statutory construction is deeply embedded in both American and Michigan jurisprudence.[79]

---

[76] I find it noteworthy that neither of the dissents in this case characterizes § 315(1) as unambiguous under any of the historical standards for discerning ambiguity or the definition enunciated in *Lansing Mayor*.

However, Justice Hathaway, in her concurring opinion, opines that § 315(1) is unambiguous. A claim that a provision is ambiguous or unambiguous is best accompanied by a discussion of what constitutes statutory ambiguity, or lack thereof. Yet Justice Hathaway fails to address this step in the process of statutory interpretation.

[77] *Sabotka v Chrysler Corp*, 447 Mich 1, 20 n 18; 523 NW2d 454 (1994).

[78] *Paschke v Retool Industries*, 445 Mich 502, 511; 519 NW2d 441 (1994), citing *Bower v Whitehall Leather Co*, 412 Mich 172, 191; 312 NW2d 640 (1981).

[79] See *Haynes*, *supra* at 42-44 (Kelly, J., concurring).

The WCAC has explicitly recognized the importance of holding employers and their insurance carriers responsible for a proration of attorney fees pursuant to § 315(1). In *Harvlie v Jack Post Corp*, the WCAC stated, "the purpose of [the] attorney fee provisions . . . is not merely to assure that a claimant's attorney is paid, but also *to deter employers from breaching their statutory duty to provide medical treatment to injured workers. . . .*"[80]

I find this reasoning persuasive and applicable to this case. If employers and their insurance carriers are not held accountable for a prorated share of attorney fees, they will have an incentive to deny medical benefits.[81] They will be tempted to deny an injured employee's request for coverage in the hope that, in

---

[80] *Harvlie v Jack Post Corp*, 2006 Mich ACO 69 at 5, citing *Lahti v Fosterling*, 357 Mich 578; 99 NW2d 490 (1959) (emphasis added).

[81] The dissents argue that my interpretation of § 315(1) will penalize employers who validly contest an employee's claim for benefits. This is not the case. Nothing in this opinion can be construed as *requiring* a magistrate to prorate fees against an employer or the employer's insurance carrier. Furthermore, even if there were a wrongful denial of medical treatment under § 315(1), the magistrate is vested with the *discretion* not to prorate fees. Thus, the denial of a treatment, whether valid or not, on its own, does not assure that an employer or its insurance carrier will be subject to a proration of attorney fees.

Justice Young correctly asserts that "a workers' compensation claimant is ordinarily responsible for his own personal attorney fees." *Post* at 6. However, § 315(1) deals not with attorney fees for a workers' compensation claim, generally, but with attorney fees specifically related to an employer's failure, neglect, or refusal to pay for "reasonable medical, surgical, and hospital services and medicines, or other attendance or treatment recognized by the laws of this state as legal, when they are needed . . ." MCL 418.315(1). Thus, a workers' compensation claimant generally remains responsible for his or her attorney fees unrelated to the matters governed by § 315(1).

subsequent litigation, they will not be found liable.  And even if they were found liable, they would be responsible only for actual medical expenses but not for attorney fees, despite their wrongful denial of valid claims.

Likewise, if injured workers were forced to pay a prorated portion of their own attorney fees, their ultimate recovery could be reduced below their actual costs of securing medical treatment.  Such a result would violate the remedial goal of the WDCA.

### 2. Caselaw Has Employed Similar Reasoning

Caselaw also supports my interpretation of § 315(1).  I find persuasive the fact that every previous case that has analyzed § 315(1) with respect to the proration of attorney fees has employed reasoning similar to mine.

The Court of Appeals first considered the proration of attorney fees pursuant to § 315(1) in *Boyce v Grand Rapids Asphalt Paving Co*.[82]  There, the plaintiff argued that his health care provider should be held responsible for a portion of his attorney fees.  The Court rejected this argument, noting that a party does not become liable for attorney fees merely by accepting the benefits of an attorney's services.[83]  The Court also ruled that § 315(1) could be construed to

---

[82] *Boyce v Grand Rapids Paving Co*, 117 Mich App 546; 324 NW2d 28 (1982).

[83] *Id*. at 549-550.

require either the employer or its insurance carrier to pay a plaintiff's attorney fees.

Finally, the Court noted that Administrative Rule 14 of the Bureau of Workers' Compensation, which was in effect when the plaintiff was injured, precluded attorneys from recovering a percentage fee for accrued medical services.[84] The Court questioned the soundness of Rule 14, noting that requiring employers or insurance carriers to pay attorney fees when they refuse to pay mandatory medical benefits would serve justice.[85]

---

[84] Before 1979, Rule 14 provided that a plaintiff's attorney shall deduct reasonable expenses before computing a fee. These included expenses for hospitals, surgery, medical providers, and burials. However, the statute was amended in 1979 and the Legislature removed these from the expenses an attorney is precluded from recovering. Thus, Rule 14 no longer prevents attorneys from recovering a percentage attorney fee assigned by a recovery of medical services. *Watkins v Chrysler Corp*, 167 Mich App 122, 131 n 1; 421 NW2d 597 (1988).

[85] *Boyce*, *supra* at 551-552 n 45. In *Zeeland Community Hosp v Vander Wal*, 134 Mich App 815; 351 NW2d 853 (1984), the Court of Appeals applied analogous reasoning. Examining § 315(1), it noted, "Since the clause concerning attorney fees follows the clause concerning the employer's refusal to pay the employer's reasonable medical expenses, the final sentence is logically construed to require either the employer or the insurance carrier to pay a portion of [a plaintiff's] attorney fees." *Id*. at 823-825. The Court also held that the statute does not evince an intent by the Legislature to require health care providers to pay a portion of attorney fees. *Id*.

The Court of Appeals used the same reasoning in *Duran v Sollitt Construction Co*, 135 Mich App 610, 615; 354 NW2d 277 (1984), which noted that § 315(1) "seems to refer to payment by the employer or his insurer . . . ." Moreover, the *Duran* Court agreed with *Boyce* that the statute precluded an assessment of attorney fees against a health care provider. *Id*.

In *Watkins v Chrysler Corp*,[86] the Court of Appeals reaffirmed the principle expounded in *Boyce* that the term "prorate" in the final sentence of § 315(1) applies to employers and their insurance carriers. *Watkins* involved an injured plaintiff who sought and was awarded workers' compensation benefits. He subsequently requested a hearing regarding his right to attorney fees related to medical expenses ultimately paid by Blue Cross Blue Shield of Michigan. The magistrate ruled that he was not entitled to such fees. The Workers' Compensation Appeal Board (WCAB) reversed the magistrate's decision and awarded attorney fees to be paid by the plaintiff's employer.

On appeal, the Court of Appeals reversed, holding that the imposition of attorney fees under § 315(1) would be unconscionable. It noted that the plaintiff's medical expenses had been timely paid and that there had been no neglect, breach of duty, or failure to provide medical care.[87] Nonetheless, the Court reiterated that the WCAB had improperly ignored the policy aspect of *Boyce* that an employer and its insurer should bear attorney fees when medical expenses are not timely paid.[88]

In contrast to *Watkins*, defendant in this case did not timely pay plaintiff's medical expenses such that there was no neglect, breach of duty, or failure to

---

[86] *Watkins v Chrysler Corp*, 167 Mich App 122; 421 NW2d 597 (1988).

[87] *Id*. at 132.

[88] *Id*. at 131-132, citing *Boyce*, *supra* at 551-552 n 45.

provide medical care. Midwest failed to pay medical expenses *despite* the fact that it was paying other workers' compensation benefits to plaintiff. As the WCAC noted, Midwest knew of plaintiff's medical bills well in advance of trial, yet simply refused to pay them. Thus, the employer "fail[ed], neglect[ed], or refus[ed]" to furnish reasonable medical expenses for plaintiff's injuries under § 315(1).[89]

Finally, in *Harvlie v Jack Post Corp*,[90] the Court of Appeals found a unity of purpose for § 315(1) by holding that its last sentence authorizes a magistrate to prorate attorney fees among an employer and its insurance carrier. The Court held:

> Here, the WCAC majority's construction of § 315(1) is consistent with a harmonious reading of the last two sentences of § 315(1). The third sentence of § 315(1) provides that "the . . . magistrate may prorate attorney fees at the contingent fee rate paid by the employee." Standing alone, this sentence contains ambiguity because it fails to identify whom the magistrate may order to pay the attorney fees. This sentence is not to be construed in isolation, however, but instead must be read in the context of the whole statute and harmonized with the statute's other provisions in a manner that effectuates the purpose intended by the Legislature. The second sentence of § 315(1) addresses the consequences of an employer's failure to pay medical expenses and authorizes a magistrate to order the employer to reimburse either the injured claimant or the claimant's medical insurance provider for the reasonable medical expenses incurred. This second sentence addresses the consequences to a nonpaying employer that "fails, neglects, or refuses" to provide reasonable medical services. The WCAC

---

[89] See *id*. at 132.

[90] *Harvlie v Jack Post Corp*, 280 Mich App 439; 760 NW2d 277 (2008).

properly construed the final two sentences of § 315(1) and provided a unity of purpose for this statute.[91]

The Court noted that its holding was consistent with prior interpretations of 315(1).[92]

In sum, I agree with the magistrate, the WCAC, the Court of Appeals, and established caselaw that employers and their insurance carriers are the only parties subject to a proration of attorney fees under § 315(1). This interpretation harmonizes the last sentence of § 315(1) with the preceding sentences of the provision as well as with the remedial goals of the WDCA. Workers' compensation magistrates may thus prorate an employee's attorney fee incurred in procuring payment for medical expenses against an employer, or against its insurance carrier, or against both.

Here, the magistrate's proration of attorney fees against defendants was appropriate, given defendants' failure to pay plaintiff's medical services as mandated by § 315(1). Accordingly, I conclude that the magistrate properly prorated plaintiff's attorney fees under § 315(1) against Midwest and Magna.

### III. THE INAPPLICABILITY OF THE AMERICAN RULE

Finally, I note that Michigan courts follow the so-called "American rule"

---

[91] *Id*. at 445-446 (citations omitted).

[92] *Id*. at 446.

with respect to the payment of attorney fees.[93] We have held that, "[u]nder the American rule, attorney fees are not recoverable from the losing party as costs in the absence of an exception set forth in a statute or court rule expressly authorizing such an award."[94] This rule is codified at MCL 600.2405(6), which provides that among items that may be taxed as costs are "[a]ny attorney fees authorized by statute or court rule."[95]

Here, § 315(1) explicitly grants magistrates the discretionary authority to prorate attorney fees related to an employer's failure to provide services in accordance with the statute. Thus, the statute contemplates that a party other than a plaintiff could, in the discretion of the magistrate, be ordered to pay attorney fees in connection with a plaintiff's suit. Accordingly, § 315(1) constitutes an express statutory authorization of attorney fees, which trumps the otherwise applicable American rule.

## IV. CONCLUSION

I recommend that the Court modify and expand the principles set forth in *Robinson v Detroit* governing when the Court should depart from the principle of stare decisis. A stare decisis analysis should always begin with a presumption that

---

[93] *Haliw v Sterling Hts*, 471 Mich 700, 706; 691 NW2d 753 (2005).

[94] *Id.* at 707.

[95] The American rule stands in contrast to the English rule. Under the English rule, the losing party pays the prevailing party's attorney fees and costs absent an exception. *Id.*

upholding precedent is the preferred course of action. Next, the Court should determine whether a compelling justification exists to overturn the precedent. A compelling justification is not a mere belief that the precedential case was wrongly decided or that the Court as currently composed would have decided the case differently. The factors listed in this opinion should be used on a case-by-case basis to determine whether a compelling justification exists to overrule an existing precedent.

However, consistent with United States Supreme Court precedent, I would accord a lower level of deference to cases that represent a recent departure from the traditional notions of stare decisis.

I also reject as unworkable the definition of statutory ambiguity espoused in *Lansing Mayor.* I conclude that MCL 418.315(1) is ambiguous because it is capable of being understood by reasonably well-informed persons in two or more different senses. As a consequence, the statute fails to clearly indicate the parties among whom attorney fees may be prorated.

Finally, we would hold that the Legislature intended that the term "prorate" in the last sentence apply only to employers and their insurance carriers. This construction is consistent with well-established principles of statutory interpretation, caselaw, the remedial nature of the WDCA, and the purpose of § 315(1). I would also hold that the American Rule of attorney fees does not apply to § 315(1).

Plaintiff's motion to dismiss defendant's application for leave to appeal is considered, and it is denied.  We affirm the judgment of the Court of Appeals.


Marilyn Kelly
Michael F. Cavanagh

STATE OF MICHIGAN

SUPREME COURT

RICK PETERSEN,

Plaintiff-Appellee,

v                                                             Nos. 136542, 136543

MAGNA CORPORATION and MIDWEST
EMPLOYERS CASUALTY COMPANY,

Defendants-Appellants,

and

KOLEASECO and THE ACCIDENT FUND
COMPANY, MAGNA CORPORATION and
TIG INSURANCE COMPANY, BCN
TRANSPORTATION SERVICES and TIG
INSURANCE COMPANY, KOLEASECO,
INCORPORATED and CITIZENS
INSURANCE COMPANY, BCN
TRANSPORTATION SERVICES, SERTA
RESTOKRAFT MATTRESS COMPANY,
INCORPORATED and HARLEYSVILLE
LAKE STATES INSURANCE COMPANY,

Defendants-Appellees.

_____

HATHAWAY, J. (*concurring*).

I concur in the lead opinion only to the extent that it concludes that the term

"prorate" in MCL 418.315(1) applies exclusively to employers and their insurance

carriers.  I write separately because I do not find MCL 418.315(1) to be

ambiguous.  Section 315(1), when read as a whole, indicates that the term

"prorate" in MCL 418.315(1) applies only to employers and their insurance carriers.

This is a case of statutory interpretation. The proper interpretation and application of a statute presents a question of law, which receives de novo review.[1] Assuming that the Legislature has acted within its constitutional authority, the purpose of judicial statutory construction is to discern and give effect to the intent of the Legislature.[2] In determining the intent of the Legislature, this Court must first look to the language of the statute.[3] The Court must, first and foremost, interpret the language of a statute in a manner that is consistent with the intent of the Legislature.[4] As far as possible, effect should be given to every phrase, clause, and word in the statute.[5] The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended.[6] Moreover, when considering the correct interpretation, the statute must be read as a whole.[7] Individual words and phrases, while important, should be read in the

---

[1] *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008).

[2] *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999).

[3] *Id.*

[4] *Id.*

[5] *Id.* at 237.

[6] *Herman v Berrien Co*, 481 Mich 352, 366; 750 NW2d 570 (2008).

[7] *Sun Valley*, *supra* at 237.

2

context of the entire legislative scheme.[8] While defining particular words in statutes, we must consider both the plain meaning of the critical word or phrase, as well as its placement and purpose in the statutory scheme.[9] A statute must be read in conjunction with other relevant statutes to ensure that the legislative intent is correctly ascertained.[10] The statute must be interpreted in a manner which ensures that it works in harmony with the entire statutory scheme.[11]

To determine the intent of MCL 418.315(1), the plain language of the statute must first be examined. Section 315(1) provides in pertinent part:

> The employer shall furnish, or cause to be furnished, to an employee who receives a personal injury arising out of and in the course of employment, reasonable medical, surgical, and hospital services and medicines, or other attendance or treatment recognized by the laws of this state as legal, when they are needed. . . . After 10 days from the inception of medical care as provided in this section, the employee may treat with a physician of his or her own choice by giving to the employer the name of the physician and his or her intention to treat with the physician. The *employer or the employer's carrier* may file a petition objecting to the named physician selected by the employee and setting forth reasons for the objection. If *the employer or carrier* can show cause why the employee should not continue treatment with the named physician of the employee's choice, . . . the . . . magistrate may order that the employee discontinue treatment with the named physician or pay for the treatment received from the physician . . . . If the employer fails, neglects, or refuses so to do, the employee shall be reimbursed for

---

[8] *Herman*, *supra* at 366.

[9] *Id.*, quoting *Bailey v United States*, 516 US 137, 145; 116 S Ct 501; 133 L Ed 2d 472 (1995).

[10] *Wayne Co v Auditor General*, 250 Mich 227, 233; 229 NW 911 (1930).

[11] *Id*. at 234.

3

the reasonable expense paid by the employee, or payment may be made in behalf of the employee to persons to whom the unpaid expenses may be owing, by order of the workers' compensation magistrate. *The workers' compensation magistrate may prorate attorney fees at the contingent fee rate paid by the employee.* [Emphasis added.]

Section 315(1) gives magistrates the discretionary authority to prorate attorney fees at the contingent fee rate paid by the employee. The question in this case is against whom attorney fees can be prorated.

Although I disagree with the lead opinion that the final sentence of § 315(1) is ambiguous, I agree with its conclusion that the final sentence of § 315(1) applies only to employers and their insurance carriers. This interpretation of the statute harmonizes the individual sentences and phrases in § 315(1) with each other. The final sentence of § 315(1) cannot be construed to stand alone without reading it in the context of the entire statute.[12] It must be examined and analyzed as part of the particular statutory provision and then harmonized with the statute's other provisions to satisfy the purpose intended by the Legislature.[13]

Section 315(1) pertains to employer liability to pay medical benefits to workers injured in the course of employment. Section 315(1) mandates that employers furnish an employee with medical treatment needed for an injury arising out of and in the course of employment. The statute also enumerates

---

[12] *People v Couzens*, 480 Mich 240, 250; 747 NW2d 849 (2008).

[13] *Farrington v Total Petroleum, Inc*, 442 Mich 201, 209; 501 NW2d 76 (1993).

4

certain types of treatment for which reimbursement costs can be contested by employers and their insurance carriers. However, if an employer fails, neglects, or refuses to provide covered medical expenses, the employer must reimburse the employee for the expenses, or make a payment to a medical provider for unpaid expenses that may be owing. The last sentence of § 315(1) gives a magistrate the discretion to prorate attorney fees at the contingent fee rate paid by the employee to recoup costs expended to recover medical expenses. Thus, the term "prorate" in the final sentence of the § 315(1), when read with the rest of the statute, applies to parties who might contest the payment of medical benefits: employers and their insurance carriers. This interpretation provides a unity of purpose for § 315(1).

In closing, I concur only with of the lead opinion's conclusion that the term "prorate" in MCL 418.315(1) applies exclusively to employers and their insurance carriers. I write separately because I do not find that § 315(1) is ambiguous. Section 315(1), when read as a whole, indicates that the term "prorate" in § 315(1) applies only to employers and their insurance carriers. This interpretation harmonizes the final sentence of the statute with the entire statute as a whole.

Diane M. Hathaway
Elizabeth A. Weaver

5

S T A T E  O F  M I C H I G A N

SUPREME COURT

RICK PETERSEN,

      Plaintiff-Appellee,

v                                                                 Nos. 136542, 136543

MAGNA CORPORATION and MIDWEST
EMPLOYERS CASUALTY COMPANY,

      Defendants-Appellants.

and

KOLEASECO and THE ACCIDENT FUND
COMPANY; MAGNA CORPORATION
and TIG INSURANCE COMPANY; BCN
TRANSPORTATION SERVICES and TIG
INSURANCE COMPANY; KOLEASECO,
INCORPORATED and CITIZENS
INSURANCE COMPANY; BCN
TRANSPORTATION SERVICES; SERTA
RESTOKRAFT MATTRESS COMPANY,
INCORPORATED and HARLEYSVILLE
LAKE STATES INSURANCE COMPANY,

      Defendants-Appellees.

_____

CORRIGAN, J. (*dissenting*).

     I fully join Justice Markman's dissenting opinion. I also join part II(B) of

Justice Young's dissenting opinion.

                                   Maura D. Corrigan

STATE OF MICHIGAN

SUPREME COURT

RICK PETERSEN,

        Plaintiff-Appellee,

V                            Nos. 136542, 136543

MAGNA CORPORATION and MIDWEST
EMPLOYERS CASUALTY COMPANY,

        Defendants-Appellants.

and

KOLEASECO and THE ACCIDENT FUND
COMPANY; MAGNA CORPORATION
and TIG INSURANCE COMPANY; BCN
TRANSPORTATION SERVICES and TIG
INSURANCE COMPANY; KOLEASECO,
INCORPORATED and CITIZENS
INSURANCE COMPANY; BCN
TRANSPORTATION SERVICES; SERTA
RESTOKRAFT MATTRESS COMPANY,
INCORPORATED and HARLEYSVILLE
LAKE STATES INSURANCE COMPANY,

        Defendants-Appellees.

_____

YOUNG, J. (*dissenting*).

I fully join in parts IV(A), IV(C) through (F), and V of Justice Markman's

dissenting opinion. I further dissent from the majority's conclusion that "the term

'prorate' in MCL 418.315(1) applies *only* to employers and their insurance

carriers,"[1] and with Chief Justice Kelly's conclusion that a workers' compensation claimant may *never* be deemed responsible for a portion of the attorney fees incurred because doing so would "violate the remedial goal of the WDCA."[2]

Normally, a workers' compensation claimant is responsible for bearing the costs of his portion of the litigation, including attorney fees.[3] I believe that MCL 418.315(1) serves as an exception to this general rule, permitting the magistrate to prorate attorney fees between the claimant and the employer when the employer refuses to pay "reasonable" and "needed" medical expenses for an injury "arising out of and in the course of employment." When an employer unjustifiably refuses to fulfill its statutory duty to pay for medical expenses incurred as a result of a work-related injury, it is entirely appropriate for the magistrate to consider whether to exercise the discretionary powers the Legislature has provided to prorate the fees between the parties according to the respective merits of their positions. In sum, the discretionary authority to prorate is a fee shifting power that *reduces* the claimant's usual obligation to bear the entire burden of his own attorney fees.

---

[1] *Ante* at 2.

[2] *Ante* at 36 (emphasis added).

[3] *Gilroy v Gen Motors Corp* (*After Remand*), 438 Mich 330, 340; 475 NW2d 271 (1991) ("As in any other civil litigation, a workers' compensation claimant is ordinarily responsible for personal attorney fees.") See also *Gross v Great Atlantic & Pacific Tea Co*, 87 Mich App 448; 274 NW2d 817 (1978).

In contrast, the majority allows only proration between the employer and its insurer, while the claimant is relieved of paying any portion of his attorney fees. As such, the majority position must be predicated on the assumption that *every* claim for benefits is meritorious and that any contest of such a claim venal. The reality is that some claims have merit and some should be contested; others may involve unresolved factual and legal questions under the Worker's Disability Compensation Act that can be definitively resolved only by the magistrate and the Workers' Compensation Appellate Commission (WCAC). In consideration of this reality, I believe that the proration provision was a legislative recognition that neither the employer nor the claimant may have entirely meritorious positions in a particular case. Thus, the magistrate has been authorized to "split the baby" and divide the claimant's fees when the respective merits of the party's positions warrant this. The majority does not prorate so much as shift the *entire* attorney fee burden from the claimant to the employer in every case.

## I. STATUTORY CONSTRUCTION

The statute at issue, MCL 418.315(1), provides in relevant part:

> The employer shall furnish, or cause to be furnished, to an employee who receives a personal injury arising out of and in the course of employment, reasonable medical, surgical, and hospital services and medicines, or other attendance or treatment recognized by the laws of this state as legal, when they are needed. . . . If the employer fails, neglects, or refuses so to do, the employee shall be reimbursed for the reasonable expense paid by the employee, or payment may be made in behalf of the employee to persons to whom the unpaid expenses may be owing, by order of the worker's compensation magistrate. The worker's compensation magistrate

3

may prorate attorney fees at the contingent fee rate paid by the employee.

It is clear that an employer has an affirmative statutory obligation to furnish "reasonable" medical treatment for personal injuries "arising out of and in the course of employment" when such treatment is "needed." However, if the employer fails to do so, the statute provides two options. If the claimant has paid the medical expenses, the "employee shall be reimbursed for the reasonable expense." However, if the expenses remain "unpaid," "payment may be made in behalf of the employee to persons to whom the unpaid expenses may be owing, by order of the worker's compensation magistrate." This sentence gives the magistrate the discretion to direct payment to the third-party medical provider on "behalf of the employee." The last sentence provides that the "worker's compensation magistrate may prorate attorney fees at the contingent fee rate paid by the employee." As I agree with the majority that the word "prorate" simply means to divide or distribute proportionately, the question in this case is simply whether the attorney fees are to be divided between the claimant and the employer, or the claimant and the medical provider.[4]

---

[4] For the reasons explained earlier, I believe that the majority has simply concluded that the employer must *always* pay the claimant's attorneys fees. While Justice Markman's interpretation of the statute is certainly plausible, I do not believe that the structure or language of MCL 418.315(1) evinces any legislative intent to impose attorney fees upon third-party medical creditors who are not parties to the litigation, did not contract with or agree to the services of plaintiff's attorney, and are entitled to the entirety of their fees (subject only to the cost

4

Reading the first sentence of the statutory provision together with the last two sentences leads to the conclusion that the fees *may* be prorated between the claimant and the employer. The first sentence establishes an affirmative duty on the employer to pay reasonable medical expenses for work-related injuries. However, if the employer "fails, neglects, or refuses so to do," payment can be compelled, either by reimbursing the claimant or paying the claimant's medical creditors directly. The last sentence of the statute relates to the sentence preceding it, permitting the proration of attorney fees between the parties when the employer "fails, neglects, or refuses" to pay needed and reasonable medical expenses related to the claimant's work-related injury. In effect, this provision permits shifting to the employer some of the attorney fee burden that the claimant would otherwise bear.

## II. ANALYTIC PROBLEMS WITH THE MAJORITY

### A

Contrary to the majority's analysis, there is no principled basis to distinguish an employer from its insurance carrier for the purposes of prorating attorney fees. It makes little sense to suggest, as the majority does, that the claimant's attorney fees can only be *prorated* between the employer and its

---

containment rules) both as a matter of statute and as a matter of contract. See MCL 418.315(2); *Boyce v Grand Rapids Asphalt Paving Co*, 117 Mich App 546; 324 NW2d 28 (1982); *Zeeland Community Hosp v Vander Wal*, 134 Mich App 815; 351 NW2d 853 (1984); and *Duran v Sollitt Construction Co*, 135 Mich App 610; 354 NW2d 277 (1984).

5

carrier. The reasons are fairly obvious. The statute does not say that proration can *only* occur between an employer and its insurer. Moreover, when an employer is *insured*, its carrier is merely its agent: the insurer's duty is to indemnify and defend its insured according to the terms of the insurance contract.[5] In the case of a *self-insured* employer, the majority's analysis makes even less sense since there is only one entity—the employer—and thus no one with whom to prorate as the majority has exempted the claimant from the proration equation. *En fin*, whether the employer is self-insured or insured, the claim is paid from the same pocket. Thus, the majority deprives the word "prorate" of any value under any circumstance, and employers will always bear the *entire* cost of attorney fees. If the Legislature had intended that *only* the employer pay a claimant's attorney fees, it could have easily said as much and presumably would have done so in much more direct language.

B

As noted, this Court and the WDCA have long recognized that a workers' compensation claimant is ordinarily responsible for paying his own personal attorney fees.[6] The majority's holding that workers' compensation claimants are categorically excluded from *ever* paying *any* portion of their attorney fees under

---

[5] *Blackwell v Citizens Ins Co of America*, 457 Mich 662; 579 NW2d 889 (1998).

[6] See n 3, *supra.* The majority does not mention this authority nor does it overrule it.

MCL 418.315(1) represents a major departure from our caselaw and is inconsistent with MCL 418.858, which permits the director to limit the "maximum attorney fees" "paid by the employee."[7] This legislative enactment, permitting the limitation of attorney fees for those representing injured workers in a workers' compensation claim, applies exclusively to disputes between attorneys and their clients[8] and recognizes that attorney fees are generally payable by the claimant.[9] Thus, contrary to the majority's claim that requiring a claimant to pay a portion of his attorney fees would "violate the remedial goal of the WDCA," decades of caselaw, as well as the plain language of MCL 418.858(2), indicate otherwise.

### C

The majority holds that the term "prorate" is limited to "the parties who might contest the payment of medical benefits: employers and their insurance carriers."[10] As an initial matter, nothing in the language of this provision limits the term "prorate" to the party *"contesting"* the payment of medical benefits, to

---

[7] MCL 418.858(2). The predecessor of this statutory provision was first enacted in 1912. See 1912 (1st Ex Sess) PA 10, part III, § 10; *Mackin v Detroit-Timkin Axle Co*, 187 Mich 8; 153 NW 49 (1915).

[8] See *Gross v Great Atlantic & Pacific Tea Co*, *supra* at 451 (MCL 418.858 "applies to disputes between attorneys and their clients; it does not apply to disputes between parties.").

[9] See *May v Charles Hoertz & Son*, 204 Mich 432; 170 NW 305 (1919); *Pearson v Gillard*, 231 Mich 541; 204 NW 725 (1925); *Vellenoweth v Gen Motors Bldg Corp*, 247 Mich 274; 225 NW 522 (1929); *Rench v Kalamazoo Stove & Furnace Co*, 290 Mich 476; 287 NW 884 (1939).

[10] *Ante* at 8.

7

the exclusion of the party "*seeking*" the payment of medical benefits. The majority adds language to the statute because the majority imagines that an employer might "be tempted to deny an injured employee's request for coverage in the hope that, in subsequent litigation, *they would not be found liable.*"[11]  However, contrary to the apparent beliefs of the majority, an employer is not statutorily liable for every medical expense submitted by a claimant.  Rather, pursuant to MCL 418.315, an employer is only obligated to pay *reasonable* and *needed* medical expenses for *work-related injuries*.  I find nothing strange or reprehensible, much less unlawful, about an employer declining to pay medical expenses that it had *no legal obligation* to pay.

Where there are legitimate legal or factual disputes to be resolved on disputed workers' compensation claims, the hearing before the workers' compensation magistrate is the *sole* mechanism that settles those disputes and determines whether the medical treatment was needed and reasonable, and whether the medical treatment was related to "a personal injury arising out of and in the course of employment."  While employers should be discouraged from *wrongly* denying medical benefits, the majority articulates no legal or logical basis for concluding that an employer should be discouraged from or punished for *correctly* denying claims to which a claimant is not entitled, or from seeking a

---

[11] *Ante* at 35-36 (emphasis added).

8

resolution of arguable legal or factual disputes that call into question the employer's obligation to pay.[12]

Here, Chief Justice Kelly's lead opinion states that "the magistrate's proration of attorney fees against defendants was appropriate, given defendants' failure to pay plaintiff's medical services as mandated by § 315(1)."[13] However, in this case, where plaintiff was a "leased" employee, there were genuine factual and legal issues to be resolved regarding whether Koleaseco or BCN Transportation was plaintiff's employer, and whether a valid workers' compensation insurance policy existed between BCN Transportation and Midwest Employers Casualty Company. In light of these unresolved issues, it is unclear that Midwest unreasonably refused to pay plaintiff's medical benefits. Moreover, the magistrate did not find that Midwest unreasonably refused to pay medical benefits as the basis for assessing attorney fees against Midwest. Rather, the magistrate assessed attorney fees against Midwest on the basis of the "substantial amount of work" and time expended by plaintiff's counsel in litigating the case.

---

[12] This is consistent with the WCAC's treatment of MCL 418.315(1), which permitted the award of attorney fees "in cases where an employer or carrier has failed, neglected, or refused to pay for medical services a claimant is clearly entitled to. Thus, an attorney fee may be awarded *only* where there was non-payment *in the face of a 'clear entitlement.'" Beattie v Wells Aluminum Corp*, 2005 ACO 157 at 10-11 (emphasis added). See also *Scheland v Jet Box Co*, 1995 ACO 242; *Gessner v Keeler Brass Co*, 1997 ACO 548; *Gronley v St Clair Fiberglass, Inc*, 2001 ACO 298; *Sikkema v Taylor Carving, Inc*, 1992 ACO 469.

[13] *Ante* at 40.

However, awarding attorney fees based on the amount of work and time expended by the attorney is in direct contravention of the last sentence of § 315(1), which contemplates the payment of attorney fees on a *contingent* rather than hourly system.  I would remand this case to the magistrate to assess the issue of attorney fees under the appropriate legal standard.


Robert P. Young, Jr.

STATE OF MICHIGAN

SUPREME COURT

RICK PETERSEN,

      Plaintiff-Appellee,

v                                                          Nos. 136542-43

MAGNA CORPORATION and MIDWEST
EMPLOYERS CASUALTY COMPANY,

      Defendants-Appellants,
and

BCN TRANSPORTATION SERVICES,
INC.; KOLEASECO, INC. and CITIZENS
INSURANCE COMPANY OF AMERICA;
KOLEASECO, INC. and ACCIDENT
FUND OF AMERICA; BCN
TRANSPORTATION SERVICES and TIG
INSURANCE COMPANY; MAGNA
CORPORATION and TIG INSURANCE
COMPANY; and SERTA RESTOKRAFT
MATTRESS COMPANY, INC. and
HARLEYSVILLE LAKE STATES
INSURANCE COMPANY,

      Defendants-Appellees.

_____

MARKMAN, J. (*dissenting*).

Because I disagree with the majority interpretation of the statute in

controversy, MCL 418.315, I respectfully dissent.[1]

_____

[1]By the "majority interpretation," I refer only to the *result* reached by a
majority of this Court in the opinions of the Chief Justice (joined by Justice

# I. BACKGROUND

Plaintiff, a truck driver, fell off his truck and injured his back while working. He sought workers' compensation benefits under the Worker's Disability Compensation Act (WDCA), MCL 418.101 et seq. The magistrate granted benefits and medical costs to plaintiff, and also imposed $46,034 against defendants for plaintiff's attorney fees pursuant to MCL 418.315(1).[2] The Workers' Compensation Appellate Commission (WCAC) affirmed.

The Court of Appeals initially denied leave to appeal, but this Court remanded for consideration as on leave granted on the division of defendants' liabilities and the assessment of attorney fees. 477 Mich 871 (2006). On remand, the Court of Appeals affirmed the WCAC's imposition of liability against certain defendants, and that issue is not the subject of this appeal. The Court of Appeals also affirmed the WCAC's assessment of attorney fees against defendants. Unpublished opinion per curiam of the Court of Appeals, issued April 17, 2008 (Docket Nos. 273293 and 273294). The majority determined that attorney fees could be imposed on employers and their insurers under § 315(1), while Judge Zahra, in dissent, concluded that § 315(1) did not allow such imposition. This Court granted leave to appeal to consider the meaning of § 315(1), 482 Mich 994

Cavanagh) and Justice Hathaway (joined by Justice Weaver).

[2] Defendants are various business entities that were either found to be plaintiff's "employer" for purposes of the WDCA or else liable for those payments as insurers.

2

(2008), and now affirms the Court of Appeals. Because I believe the Court of Appeals dissent is correct, I dissent.

## II. STANDARD OF REVIEW

Questions of statutory interpretation are reviewed de novo. *Brackett v Focus Hope, Inc*, 482 Mich 269, 275; 753 NW2d 207 (2008).

## III. STATUTE

MCL 418.315(1) provides, in part:

> The employer shall furnish, or cause to be furnished, to an employee who receives a personal injury arising out of and in the course of employment, reasonable medical, surgical, and hospital services and medicines, or other attendance or treatment recognized by the laws of this state as legal, when they are needed . . . The employer shall also supply to the injured employee dental service, crutches, artificial limbs, eyes, teeth, eyeglasses, hearing apparatus, and other appliances necessary to cure, so far as reasonably possible, and relieve from the effects of the injury. If the employer fails, neglects, or refuses so to do, the employee shall be reimbursed for the reasonable expense paid by the employee, or payment may be made in behalf of the employee to persons to whom the unpaid expenses may be owing, by order of the worker's compensation magistrate.[3] The worker's compensation magistrate may prorate attorney fees at the contingent fee rate paid by the employee.

The instant dispute centers on the meaning of the final sentence, specifically what it means for the magistrate to be allowed to "prorate attorney fees." Plaintiff contends, and a majority of this Court agrees, that this sentence allows a magistrate, when granting a recovery under the penultimate sentence, to order the

---

[3] Presumably, if the employee has not paid the reasonable expenses for "medical, surgical, and hospital services," then the medical providers of those services are the "persons to whom the unpaid expenses may be owing."

3

employer to pay, in addition to the amount awarded for reimbursement of unpaid medical expenses, the employee's attorney fees attributable to the unpaid benefits.[4]  Defendants, however, argue that the final sentence allows a magistrate, when ordering an employer to pay unpaid medical expenses to "persons to whom the unpaid expenses may be owing," to deduct a proportionate share from those payments for the employee's attorney fees.[5]

The primary goal of statutory interpretation is to discern and give effect to the Legislature's intent.  *Neal v Wilkes*, 470 Mich 661, 665; 685 NW2d 648 (2004).  A court first looks at the statute's language, *Brown v Detroit Mayor*, 478 Mich 589, 593; 734 NW2d 514 (2007), from which "the Legislature's intent must be gathered," *Frankenmuth Mut Ins Co v Marlette Homes, Inc*, 456 Mich 511, 515; 573 NW2d 611 (1998) (quotation marks omitted).  When reviewing the statute, "[a]ll words and phrases shall be construed and understood according to the common and approved usage of the language," MCL 8.3a, and "a word or

---

[4] Under this approach, if the magistrate ordered the employer to pay either the employee or a medical provider $2,000 for unpaid expenses, the magistrate could also order the employer to pay the employee's attorney fees for the contingency fee on that amount.  Assuming a 30% contingency fee, the employer would pay $2,600 total, with $2,000 paid to the employee or medical provider and $600 paid to the employee's attorney.

[5] Under this approach, if the magistrate ordered the employer to pay a medical provider $2,000 for unpaid expenses, the magistrate would apportion an amount based on the employee's contingency fee from that payment to go towards the employee's attorney fees.  Assuming a 30% contingency fee, the employer would pay $2,000, with $600 paid to the employee's attorney and $1,400 paid to the medical provider.

4

phrase is given meaning by its context or setting,"[6] *Koontz v Ameritech Services, Inc*, 466 Mich 304, 318; 645 NW2d 34 (2002).

I agree with the Court of Appeals dissent, and with defendants, that the better interpretation of § 315(1)'s final sentence is that a magistrate can apportion an amount of the employee's attorney fees from an employer's payment to the medical care providers. This interpretation rests principally on the meaning of "prorate," which means "to divide, distribute, or calculate proportionately." *Random House Webster's College Dictionary* (1997). Thus, the final sentence can be read to allow the magistrate to either divide or distribute proportionately attorney fees. That the division or distribution must be proportionate necessarily implies that there must be some *basis*, or rational calculation, upon which the total amount of attorney fees can be divided or distributed. This basis becomes increasingly apparent when § 315(1)'s final sentence is considered with the previous sentence, in which the magistrate is directed to order the employer to make "payment . . . in behalf of the employee to persons to whom the unpaid expenses may be owing." Thus, payments will be made to medical providers in the amount of the unpaid expenses owed by the employee. These payments logically supply the basis upon which the attorney fees can be proportionately divided, because each payment constitutes a portion of the whole on which the

---

[6] "It is only, therefore, within a context that a word, any word, can communicate an idea." *Leach v FDIC*, 860 F2d 1266, 1270 (CA 5, 1988).

employee's attorney fees are calculated.[7]  That is, if the magistrate orders payment to multiple medical providers, then a share of the employee's attorney fees is deducted from each payment based on the proportion of the whole that each payment represents.

The Legislature's use of the word "may" to confer upon the magistrate the authority to "prorate attorney fees" lends further support to this interpretation.  By this word choice, the Legislature has indicated that there are times when a magistrate might *not* "prorate attorney fees."  If "prorate" is interpreted to allow a division of fees between medical care providers, then the use of "may" in this context makes sense.  In those instances that the magistrate directs payment to the medical providers, the magistrate *would* divide the fees, but when the magistrate only ordered reimbursement to the employee for his or her "reasonable expenses paid," the magistrate would not divide the fees.  Thus, the final sentence recognizes that under the penultimate sentence the magistrate may direct payment either to the employee, in which case the division of attorney fees would be inappropriate, or the magistrate may direct payment to multiple medical care

---

[7] This interpretation reflects the common understanding of the term "prorate" as often used, for example, in rental arrangements.  A landlord will often "prorate" the tenant's rent when the lease does not begin on the first of the month. The tenant pays a prorated amount of the monthly rent based on the number of days (out of the whole month) that the tenant will be living in the apartment before the beginning of the next month.

providers, or to the employee and medical care providers, in which case division of the attorney fees would be appropriate.

By contrast, the majority interpretation of § 315(1)'s final sentence allows a magistrate to impose attorney fees against the employer, in addition to the payment for unpaid medical expenses, with utterly no direction concerning the circumstances in which the magistrate should do so. That is, the majority interpretation accords the magistrate the *discretion* to assess attorney fees against an employer when the employer "fails, neglects, or refuses" to pay benefits, but provides no guidance for ascertaining when that discretion should or should not be exercised. Had the Legislature truly intended for the magistrate to impose attorney fees against an employer, it seems likely that the Legislature would have included *some* standard for determining the circumstances under which fees should be assessed.[8]

Even more troubling is that the Chief Justice apparently finds the entire final sentence of § 315(1) irrelevant in concluding that a magistrate can impose attorney fees against an employer. She states:

---

[8] The Chief Justice asserts that giving the magistrate such standardless discretion is supported by "[o]ther provisions of the WDCA that vest similar discretion in magistrates using the word 'may.'" *Ante* at 9 n 19. Contrary to her assertion, however, those other provisions do not similarly vest in a magistrate standardless discretion; rather, they provide at least some specific *direction* by which the magistrate is to exercise his discretion. With regard to the final sentence of § 315(1), this dissent finds that direction in the penultimate sentence of § 315(1); by contrast, the Chief Justice finds the penultimate sentence to be irrelevant to her analysis.

7

> [T]he word 'may' bears on whether a proration must occur if a magistrate does award attorney fees. . . . Should a magistrate determine that only one [party] is liable, the magistrate may impose attorney fees against only that party. Conversely, should the magistrate find multiple parties liable, fees may be prorated accordingly. [*Ante* at 8-9.]

Thus, the Chief Justice interprets § 315(1) to allow a magistrate to impose attorney fees absent any "proration" of the fees because she interprets "may" as according the magistrate the discretion to decide "whether a proration must occur," *after he has already decided to award attorney fees*. If the magistrate determines that the attorney fees should be imposed on "multiple parties," then the magistrate can "prorate" or divide the fees among those parties. However, if "only one [party] is liable," the magistrate can impose the fees "against only that party" without having to "prorate" or divide the fees at all. This completely fails to recognize that § 315(1) only allows the magistrate to "prorate" or not "prorate" attorney fees. Interpreting § 315(1) to allow the magistrate to impose attorney fees without relying on the specific authority to "prorate" reads an authorization into the statute that clearly does not exist.

The Chief Justice supports her interpretation by reasoning that because the "statute . . . provides a process for employers and their insurance carriers to object to the medical treatment that an injured employee seeks," the final sentence "when read with the remainder of the statute, applies to the parties who might contest the payment of medical benefits: employers and their insurance carriers." *Ante* at 8. That is, to "harmonize[] the final sentence with the remainder of § 315," and to

8

avoid the final sentence "stand[ing] alone," § 315(1)'s final sentence must be read to impose additional liability on employers and their insurers, in order to maintain a "unity of purpose." *Ante* at 7-8; see also *ante* at 4 (Hathaway, J., concurring). Contradicting this pursuit of "harmony" and "unity," however, are fundamental differences between § 315(1)'s final sentence and the preceding sentences, which clearly establish an employer's liability for *particular* expenses. In these preceding sentences, the Legislature states that the employer "shall furnish, or cause to be furnished," various reasonable medical expenses and that the employer "shall also supply" various correctional devices (e.g., eyeglasses, artificial limbs, crutches). MCL 418.315(1). If the employee pays these reasonable expenses, then under the penultimate sentence the employee "shall be reimbursed" for the reasonable expense paid by the employee. *Id.* Thus, the penultimate sentence relates back to the listed expenses that an employer "shall" pay. Attorney fees are not included in those expenses; yet the majority interpretation effectively gives the phrase "may prorate" the same meaning as the phrases "shall furnish" and "shall supply" so that the final sentence imposes an additional payment obligation upon the employer. This conclusion is contrary to the logical assumption that, had the Legislature intended to affirmatively impose payment of attorney fees upon an employer, it would have done so with at least approximately the same clarity with which it imposed liability for other expenses upon the employer earlier within the

same subsection.[9]  Instead, the Legislature chose to use considerably different language in the final sentence than in the immediately preceding sentences.[10]

The final sentence is much better read, in my judgment, as an adjunct to the magistrate's ability to direct payment to medical providers established in the penultimate sentence.  The legislative amendment adding the final sentence to § 315(1) specifically supports such a relationship.  Before this amendment, the then-final sentence of former MCL 412.4, which is now § 315(1)'s penultimate sentence, only allowed the *employee* to receive payment for medical expenses:

> If the employer shall fail, neglect or refuse so to do, such employee shall be reimbursed for the reasonable expense incurred by or on his behalf in providing the same, by an award of the commission.  [MCL 412.4, as amended by 1955 PA 250.]

When the Legislature amended the statute to allow payment to also be directed to the medical providers, it added the now-final sentence in dispute here:

> If the employer shall fail, neglect or refuse so to do, such employee shall be reimbursed for the reasonable expense paid by him, or payment may be made in behalf of such employee to persons to whom such unpaid expenses may be owing, by an award of the

---

[9] Indeed, the Legislature has been fairly consistent throughout the WDCA when it imposes liability against the employer.  For example, § 301(1) states that an employee "*shall be paid* compensation as provided in this act"; § 345 states that "the employer *shall pay*, or cause to be paid, the reasonable expense of the employee's last sickness, funeral, and burial"; and § 351(1) states that "the employer *shall pay*" weekly compensation when the employee is totally incapacitated from work.  (Emphasis added.)

[10] Although the Chief Justice and Justice Hathaway purport to "read [§ 315(1)'s final sentence] with the remainder of the statute," *ante* at 8 and *ante* at 5 (Hathaway, J. concurring), both fail to even give consideration to the language in the immediately preceding sentence.

> commission. The commission may prorate attorney fees in such cases at the contingent fee rate paid by such employee and it may also prorate such payments in the event of redemptions. [MCL 412.4, as amended by 1963 PA 199.]

Thus, the magistrate's ability to "prorate attorney fees" directly accompanied the magistrate's ability to direct payments to medical providers.[11] This association seems to indicate that the Legislature recognized that when medical providers received payment from the employer, the medical providers themselves could fairly be said to have been enriched by the work of the employee's attorney.

Prior to the amendment, a medical provider was relegated to seeking payment from the employee through a separate cause of action. Even if the medical providers recovered the full amount in the action, each would still have to pay its own attorney costs due to the longstanding "American Rule" regarding

---

[11] Recognizing that "not all legislative history is of equal value," *In re Certified Question*, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003), this amendment of the statute constitutes the legislative action that established the present relationship between § 315(1)'s penultimate and final sentences that can be gleaned from the sentences themselves. See *supra* at 6-7. As such, the *fact* of this amendment represents what is clearly the most compelling form of legislative history, because it is derived purely from the enacted words of the statute. On the other hand, relying on legislative history based upon a legislative analysis, see, e.g., *Adrian School Dist v Michigan Pub School Employees' Retirement Sys*, 458 Mich 326, 335; 582 NW2d 767 (1998) (Kelly, J.); *Omne Financial, Inc v Shacks, Inc*, 460 Mich 305, 315 n 12; 596 NW2d 591 (1999) (Kelly, J.), created by staff offices within the Legislature is significantly less compelling, *In re Certified Question*, 468 Mich at 115 n 5, and legislative history that relies exclusively upon the statements of a single one of 110 members of the House of Representatives, or a single one of 38 members of the state Senate, is even less compelling.

attorney fees.[12] In effect, the Legislature set forth a shortcut to this practice in §

315(1). Rather than requiring medical providers to hire their own attorneys and

commence separate actions against the employee, § 315(1) now allows the

medical provider to recover through the action instituted by the employee.[13]

---

[12] In *Haliw v Sterling Hts*, 471 Mich 700, 706-707; 691 NW2d 753 (2005), we stated:

> Michigan follows the "American rule" with respect to the payment of attorney fees and costs. Under the American rule, attorney fees generally are not recoverable from the losing party as costs in the absence of an exception set forth in a statute or court rule expressly authorizing such an award. [Citation omitted.]

[13] This is similar to the arrangement provided by § 821(2), which allows an employee to assign a portion of his workers' compensation award to an insurance company, health maintenance organization, or medical care and hospital service corporation that makes an advance or payment to the employee under an insurance policy that provides that benefits are not payable for workers' compensation injuries. Upon enforcement of that assignment, the insurance company, health maintenance organization, or medical care and hospital service corporation shall pay "a portion of the attorney fees of the attorney who secured the worker's compensation recovery." MCL 418.821(2). Thus, the employee retains an attorney to recover benefits, and the recovery subject to the assignment helps pay the employee's attorney fees.

Likewise, pursuant to § 827, a nonparty employer can recover through the efforts of an employee's attorney pursuing a third-party liability action, whereby an employee can seek recovery for the same damages he "would be entitled to recover in an action in tort." MCL 418.827(5). If the employee recovers, then he shall first "reimburse the employer or carrier for any amounts paid or payable" under the WDCA, reduced by "expenses of recovery," *id*., which include "reasonable expenditures, including attorney fees, incurred in effecting recovery," MCL 418.827(6). Thus, the employer does not recover the full amount it paid under its workers' compensation policy. Rather, the full amount is less any attorney fees, which the employer would have had to pay had it sued the third party for recovery as it is entitled to do. MCL 418.827(1) (employer can bring suit against third party in name of employee if one year has passed since the

Medical providers receive the same reimbursement amount as they did before the amendment, while employees retain more of the recovery to which they are entitled.[14]

The majority interpretation would impose an additional cost upon the workers' compensation process by penalizing employers and forcing them to pay not only for their own attorneys, but also for their employees' attorneys. This

---

employee's injury). This reduction of the recovery amount is the same as when a magistrate "prorates" pursuant to § 315(1)'s final sentence.

[14] The financial outcome for medical providers remains the same, whereas, by eliminating the need for providers to hire attorneys, the employee actually keeps more of his medical expenses. For example, assume that an employee has paid $3,000 in medical expenses provided for in § 315(1) and still owes a medical provider $2,000 for such expenses. Further assume that attorney fees are 30% of any recovery. Prior to the addition of § 315(1)'s final sentence, an employee would seek recovery of $5,000 from the employer and, upon receiving that amount, would owe his attorney $1,500. After the medical provider commenced an action for the $2,000 and obtained a judgment for that amount, the employee would be left with $1,500, half of what he paid. The medical provider would owe its attorney $600, meaning that the medical provider recovered $1,400 for its $2,000 bill. Thus, the employee retained $1,500, the medical provider retained $1,400, and the attorneys (employee's and medical provider's) went home with $2,100. On the other hand, after the addition of § 315(1)'s final sentence as interpreted in this dissent, the magistrate would direct payment of $2,000 to the medical provider but with $600 appropriated for the employee's attorney. The magistrate would also direct payment of $3,000 to the employee but with $900 appropriated for the employee's attorney. As a result, the medical provider recovers the same amount that it would have recovered in a separate action against the employee, but the employee is left with $2,100, which is $600 more than he would have recovered under the old system. The $600 is available because the Legislature provided a way in which recovery could be realized by both the employee and the medical provider without requiring both to hire their own attorneys.

13

increased expense is at odds with § 801(3), in which the Legislature has *already* provided a penalty for unpaid medical benefits:

> If medical bills or travel allowance are not paid within 30 days after the carrier has received notice of nonpayment by certified mail, in cases where there is no ongoing dispute, $50.00 or the amount of the bill due, whichever is less, shall be added and paid to the worker for each day over 30 days in which the medical bills or travel allowance are not paid. Not more than $1,500.00 in total may be added pursuant to this subsection.

The majority interpretation would establish a new penalty provision with § 315(1)'s final sentence that is inconsistent with the WDCA's actual penalty provision, in which the Legislature expressly provides for a penalty payment only "where there is no ongoing dispute." Nothing in the majority interpretation prevents the attorney-fees penalty from operating even in the presence of a dispute, which is directly contrary to when the Legislature has stated a penalty should apply. If the Legislature intended § 315(1) to operate as a penalty provision, then it would seem that such penalty would at least be assessed consistently with the penalty provided under § 801(3). This lack of consistency casts further doubt on the majority interpretation.

With respect to the magistrate's authority over medical providers that are not parties to the action, § 315(2) implies that the magistrate indeed does have authority over medical providers when they are operating in the context of § 315 by providing that any recovery by a medical provider can be reduced by the magistrate to the "maximum charge established *under the rules*." (Emphasis added.) Thus, the magistrate may reduce the provider's recovery even if the

14

provider is not a party to the action. It follows that the magistrate has the same ability to reduce the recovery to pay for an employee's attorney fees when the statute grants the magistrate such authority in § 315(1).[15]

In conclusion, several clues supplied by § 315(1) and the WDCA support the interpretation set forth in this dissent. Particularly relevant in this regard are: (1) the use of "prorate," the proportionality of the division this term conveys, and the fact that there is some logical standard or basis for calculating proportions under this interpretation, but not under the majority interpretation; (2) the use of "may" in describing the magistrate's authority to prorate, and the fact that there is

---

[15] I also respectfully disagree with Justice Young's interpretation that § 315(1) "permit[s] the magistrate to prorate attorney fees between the claimant and the employer . . . ." *Ante* at 2. First, he does not account for why the magistrate's authority to "prorate attorney fees" is only triggered "when an employer unjustifiably refuses to fulfill its statutory duty to pay for medical expenses . . . ." *Ante* at 2. It would seem more logical under his interpretation that a magistrate could impose attorney fees against an employer *any time* the employer "fails, neglects, or refuses" to pay for the medical expenses. Nowhere does the statute include the caveat that the refusal must be "unjustified" before the magistrate can "prorate" the fees. Second, the statute directs proration "at the contingent fee rate paid by the employee," MCL 418.315(1), not "according to the respective merits of [the parties'] positions," *ante* at 2. Third, the penultimate sentence "provides two options"-- the magistrate can direct payment to the employee or to medical providers-- and Justice Young, in my judgment, fails to recognize that these options provide an obvious statutory basis upon which the magistrate can exercise his discretion to "prorate attorney fees." Finally, although medical providers are, in fact, "entitled to the entirety of their fees" before litigation, *ante* at 4 n 4, the reality is that a recovery will always be subject to attorney fees. Rather than "impos[ing]" fees against the providers, the Legislature created a mechanism whereby the fees are simply deducted from the recovery being paid to the provider, and whereby the number of "parties to the litigation" can be reduced, without affecting the outcome to those potential parties.

15

some logical standard or basis for exercising this authority under this interpretation, but not under the majority interpretation; (3) the consistency of this interpretation, and the lack of consistency of the majority interpretation, with the penalty provision in § 801(3); (4) the fact that the majority interpretation reads words into § 315(1) that are absent and nullifies words that are present; (5) the significant differences in language between the introductory sentences of § 315(1), which clearly establish an employer's liability for particular expenses, and its final sentence, which does nothing equivalent; (6) the logical implications drawn from § 315(1)'s final sentence being positioned after the penultimate sentence, and the legislative amendment of § 315(1); and (7) the similarity in the arrangement between employees' attorneys and medical providers set forth in this dissent and the arrangement between employees' attorneys and nonparties set forth in §§ 821 and 827.

## IV. RESPONSE TO THE CHIEF JUSTICE

Not content with merely misconstruing the law, the Chief Justice adopts an approach to statutory interpretation that can only be described as bizarre. She *begins* her interpretation by asserting that the "threshold question is whether . . . the last sentence of § 315(1) is ambiguous." *Ante* at 7.[16] After an entirely gratuitous citation to the dictionary definition of "prorate," one that promptly proves to be irrelevant to any subsequent analysis, the Chief Justice determines

---

[16] I note that this approach has not garnered majority support on this Court.

16

that "the term 'prorate' could reasonably apply to employers, their insurance carriers, health care providers, and to employees seeking workers' compensation benefits, or to any combination of them." *Ante* at 7. This finding should come as no surprise considering the Chief Justice's focus on the word "prorate" without regard to its context. Next, the Chief Justice initially determines that "neither § 315 as a whole nor the statute's other provisions indicates the parties to whom a division or distribution of attorney fees applies," but nevertheless proceeds to adopt her own interpretation because it "unifies the last sentence of § 315(1) with the remainder of the statute." *Ante* at 8. Satisfied that her interpretation also gives effect to the word "may," cf. *supra* at 7-8, the Chief Justice then concludes that her interpretation "affords the phrase 'may prorate' its full meaning." *Ante* at 9. After all this, the Chief Justice continues to answer her "threshold question" in the affirmative, concluding that the statute is ambiguous because other "interpretations of § 315(1) exist." *Ante* at 9. That is, rather than even giving the *appearance* that she has reached the conclusion that the statute is "ambiguous" based upon her difficulty in ascertaining its meaning, the Chief Justice withdraws from the process of statutory interpretation once other interpretations are presented. It is apparently much easier to summarily declare "ambiguity," and thereby avoid the inconvenience of having to actually carry out one's judicial duties by deciding what the statute or contract actually states.[17]

---

[17] Because interpreting either statutes or contracts requires a court to give

A. Ambiguity

As evident from her "interpretation" here, the Chief Justice's dependence on an extraordinarily low threshold for finding ambiguity, and her resultant conclusion that § 315(1) is, of course, "ambiguous," are essential to her analysis. The Chief Justice then proceeds on the assumption that, once ambiguity has been established, a judge is essentially unencumbered by any serious restraints imposed by the language of a statute or contract and effectively has carte blanche to utilize whatever factors are deemed appropriate in reaching a result.

I disagree with this approach to "interpretation," not merely because it divorces the interpretative process from the law that is purportedly being "interpreted," but also because it raises the unavoidable suspicion that a judge is reaching the result he or she would *personally* prefer rather than the result compelled by the law. That is, instead of abiding by the traditional exercise of the "judicial power" in which the judge, employing the statute or contract itself as the lodestar, says only what the law "is," the Chief Justice by her understanding of ambiguity would effectively exercise the "legislative power" to say what the law "ought to be" by arbitrarily picking and choosing among a practically limitless

---

meaning to specific language, the interpretative approach signaled by a particular view of ambiguity "applies with equal force whether the court is interpreting a statutory text or a contractual one." *Mayor of Lansing v Pub Service Comm*, 470 Mich 154, 165 n 6; 680 NW2d 840 (2004). See also *Ellis v Farm Bureau Ins Co*, 482 Mich 1119, 1120-1121; 760 NW2d 212 (2008); *Zahn v Kroger of Michigan*, 483 Mich 34, 40 n 8; 764 NW2d 207 (2009).

variety of available extra-textual considerations.[18] For the Chief Justice, the concept of ambiguity is one to be both casually and peremptorily invoked-- as in this case in which no party has even asserted that the statute is ambiguous-- to avoid the discipline of the traditional judicial process, while maintaining at least some appearance that this process has been respected. The lower the barrier to finding ambiguity, the more effortlessly a judge can dispense with the hard work of giving meaning to difficult and complex provisions of statutes and contracts, and the less risk that this regular process of interpretation will lead to the "wrong" results. A facile resort to ambiguity affords the judge a readily-available means of acting beyond the scope of his or her authority to exercise exclusively the "judicial power."

It is hard to conceive of a much lower barrier to ambiguity than that propounded by the Chief Justice. A statute, we are instructed, is "ambiguous" when it is "capable of being understood by reasonably well-informed persons in two or more different senses."[19] *Ante* at 33. If this definition does not describe

---

[18] When deciding a case, the judiciary's role is, and has always been, to answer the question, "what is the law, and not what ought the law to be." *Detroit v Blackeby*, 21 Mich 84, 118 (1870) (Cooley, J., dissenting); see also *Michigan United Conservation Clubs v Secretary of State (After Remand)*, 464 Mich 359, 397; 630 NW2d 297 (2001) (Markman, J., concurring), citing *Marbury v Madison*, 5 US (1 Cranch) 137; 2 L Ed 60 (1803). "It is for the court to declare what the law is-- not to make it." *Wilson v Arnold*, 5 Mich 98, 104 (1858).

[19] The Chief Justice also states that a statute is ambiguous when "two persons reasonably afford [a] different meaning[ ]" to it, or when it is "of questionable or unclear meaning." *Ante* at 31. She has previously opined that a

19

almost *all* litigation coming before this Court, it certainly describes *much* of this litigation. There are relatively few appellate litigants-- most of whom have undertaken the financial burdens of litigation, accepted the psychological and emotional tolls of a protracted legal process, and endured trial, intermediate appeal, Supreme Court appeal, remands, and motions for reconsideration, all while being represented by attorneys who are ethically obligated to ensure some degree of meritoriousness in their clients' legal positions-- whose statutory and contractual disputes could not be fairly characterized under the Chief Justice's definition as entailing ambiguity. Indeed, little would be clearly *excluded* from the realm of ambiguity by her definition other than genuinely frivolous lawsuits, which are both rare and sanctionable. Matters of interpretation are resolved in judicial venues precisely because statutes and contracts are susceptible to "being understood by reasonably well-informed persons in two or more different senses."

---

statue is ambiguous "when its application to the facts of the case is uncertain," *DaimlerChrysler Corp v State Tax Comm*, 482 Mich 220, 240 n 2; 753 NW2d 605 (2008) (Kelly, J., concurring in the result), or when "there can be reasonable disagreement over its meaning," *Fluor Enterprises, Inc v Dep't of Treasury*, 477 Mich 170, 186; 730 NW2d 722 (2007) (Kelly, J., concurring). As with her latest definition of ambiguity in this case, what would be truly remarkable about *any* of these definitions would be if they served to *exclude* many statutory or contractual disputes from their purview. "Uncertainty" and "disagreement" are what draw parties into litigation in the first place. See also *Nat'l Pride at Work, Inc v Governor*, 481 Mich 56, 95 n 34; 748 NW2d 524 (2008) (Kelly, J., dissenting), in which the Chief Justice asserted that a general provision of Michigan's constitution was "ambiguous" because it did not expressly set forth every specific circumstance to which it was applicable. The majority responded, "If that were the case, almost all constitutional provisions would be rendered ambiguous." *Id.* at 81 n 21.

Even more remarkable, however, is that the Chief Justice's own "analysis" in this case does not even satisfy her own low threshold for discerning ambiguity, since there is nothing therein that suggests that *either* the plaintiff's or the defendants' position is "reasonable." In fact, the Chief Justice never once compares *any* interpretation other than her own to the statute. She simply notes the "exist[ence]" of competing interpretations and declares ambiguity. *Ante* at 9. Essentially, the Chief Justice's standard for discerning ambiguity is more accurately stated as: "A statute is ambiguous when parties offer conflicting interpretations."[20]

The Chief Justice has previously observed that, "I find frequent ambiguity in statutory language." *Haynes v Neshewat*, 477 Mich 29, 40; 729 NW2d 488 (2007) (Kelly, J., concurring).[21] This is not surprising. For once a statute or

---

[20] Such disagreement between parties is hardly a precedent-shattering event in this Court.

[21] At least in this regard, she is unquestionably correct. See, for example, the following list of cases enumerated in footnote 56 of the Chief Justice's opinion to get some sense of the breadth of the matters that she apparently views as "ambiguous" among our published opinions over the past five years alone. With regard to each of these "examples," the dissenting justices in this case are implicitly chastised for having "declined" to find ambiguity:

> See, e.g., *Dimmit & Owens Fin, Inc v Deloitte & Touche*, 481 Mich 618; 752 NW2d 37 (2008); *Ross v Blue Care Network*, 480 Mich 153; 747 NW2d 828 (2008); *Wesche v Mecosta Co Rd Comm*, 480 Mich 75; 746 NW2d 847 (2008); *Ernsting v Ave Maria College*, 480 Mich 985 (2007); *Trentadue v Buckler Lawn Sprinkler*, 479 Mich 378; 738 NW2d 664 (2007); *Lash v Traverse City*, 479 Mich 180; 735 NW2d 628 (2007); *Brown* [*v Detroit Mayor*, 478 Mich

21

contract has been deemed "ambiguous," this Court "may go beyond the plain

language of the statute [or contract]," *ante* at 6, and then employ decision-making

589; 734 NW2d 514 (2007)]; *Renny v Dep't of Transportation*, 478 Mich 490; 734 NW2d 518 (2007); *South Haven v Van Buren Co Bd of Comm'rs*, 478 Mich 518; 734 NW2d 533 (2007); *Omdahl v West Iron Co Bd of Ed*, 478 Mich 423; 733 NW2d 380 (2007); *Bukowski v Detroit*, 478 Mich 268; 732 NW2d 75 (2007); *Karaczewski v* [*Farbman Stein & Co*, 478 Mich 28; 732 NW2d 56 (2007)]; *Fluor* [*Enterprises, Inc v Dep't of Treasury*, 477 Mich 170; 730 NW2d 722 (2007)]; *Rowland* [*v Washtenaw Co Rd Comm*, 477 Mich 197; 731 NW2d 41 (2007)]; *People v Peals*, 476 Mich 636; 720 NW2d 196 (2006); *Paige* [*v Sterling Hts*, 476 Mich 495; 720 NW2d 219 (2006)]; *Cameron v Auto Club Ins Ass'n*, 476 Mich 55; 718 NW2d 784 (2006); *Ford Motor Co v Woodhaven*, 475 Mich 425; 716 NW2d 247 (2006); *People v Derror*, 475 Mich 316; 715 NW2d 822 (2006); *People v Williams*, 475 Mich 245; 716 NW2d 208 (2006); *People v Yamat*, 475 Mich 49; 714 NW2d 335 (2006); *Grimes* [*v Dep't of Transportation*, 475 Mich 72; 715 NW2d 275 (2006)]; *Michigan v Monaco*, 474 Mich 48; 710 NW2d 46 (2006); *Ostroth v Warren Regency, GP, LLC*, 474 Mich 36; 709 NW2d 589 (2006); *Co Rd Ass'n v Governor*, 474 Mich 11; 705 NW2d 680 (2005); *Devillers* [*v Auto Club Ins Ass'n*, 473 Mich 562; 702 NW2d 539 (2005)]; *Reed v Yackell*, 473 Mich 520; 703 NW2d 1 (2005); *Ayar v Foodland Distributors*, 472 Mich 713; 698 NW2d 875 (2005); *Casco Twp* [*v Secretary of State*, 472 Mich 566; 701 NW2d 102 (2005)]; *Elezovic v Ford Motor Co*, 472 Mich 408; 697 NW2d 851 (2005); *Jarrad v Integon Nat'l Ins Co*, 472 Mich 207; 696 NW2d 621 (2005); *Roberts v Atkins*, 470 Mich 679; 684 NW2d 711 (2004); *Neal* [*v Wilkes*, 470 Mich 661; 685 NW2d 648 (2004)]; *People v Barbee*, 470 Mich 283; 681 NW2d 348 (2004); [*People v*] *Lively*, [470 Mich 248; 680 NW2d 878 (2004)]; *People v Laney*, 470 Mich 267; 680 NW2d 888 (2004); *Lansing Mayor* [*v Pub Service Comm*, 470 Mich 154; 680 NW2d 840 (2004)].

It should be clearly understood that in each of these cases, as well as in all other cases in which ambiguity is found, justice under the *law* would be replaced by the personal "justice" of the men and women who comprise the Court's majority. This is the "rule of men [and women]," not the rule of law.

22

factors that would ordinarily be unavailable in the interpretative process. There is no lack of variety in these newly-available factors. As I offered in my concurring opinion in *Haynes*:

> Having reached the proper result in this case through a proper legal analysis, Justice Kelly in a concurrence to her own majority opinion proceeds to demonstrate that she could have reached the same result through less disciplined means. Not content to rely, as she does in her majority opinion, on the actual language of the law, Justice Kelly invokes an array of alternative techniques to "interpret" the law in her concurring opinion. She relies upon a "liberal construction" of the statute in question; she relies upon characterizations of the statute as "broad" and "remedial"; she relies upon a summary description of the law as "ambiguous," therefore apparently affording her the discretion to pick and choose the law she prefers; she relies upon the Legislature's inaction in the wake of an earlier court decision, equating this to approval of the Court's decision; she disparages the value of dictionaries as an essential tool in the interpretative process; and she relies upon an extraordinarily broad understanding of "legislative history." For the sake of future reference, a further catalogue of language-avoidance "interpretative" techniques would include the following: divining the "spirit of a statute"; relying upon considerations of "public policy"; standardlessly applying "equity"; characterizing statutes with which a judge disagrees as "absurd"; and concocting creative "balancing" and "totality of circumstances" tests. Innovatively applied, each of these techniques can be relied upon to avoid the hard task of having to discern a statute's meaning from its actual language. [*Haynes*, 477 Mich at 48-49 (Markman, J., concurring).]

The use of these and other factors to reach a decision far more closely resembles the exercise of the constitution's "legislative power" than its "judicial power." It is an undisciplined and standardless approach to giving meaning to the law, enabling the judge at his or her discretion to determine which factors to take into

23

account, and what priority to give those factors.[22]   It is an approach that disrespects the separation of powers[23] and that enhances the power of judges at the expense of the rule of law. [24]

### B. Dissent and Ambiguity

The Chief Justice's definition of ambiguity stands in contrast to what has been the predominant approach in our state.  In *Mayor of Lansing v Pub Service Comm*, 470 Mich 154, 166; 680 NW2d 840 (2004), this Court stated that "a provision of the law is ambiguous only if it 'irreconcilably conflict[s]' with another provision or when it is *equally* susceptible to more than a single meaning." (Citation omitted.)  Similarly, in *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 467; 663 NW2d 447 (2003), this Court found a contract to be ambiguous because two provisions "irreconcilably conflict[ed]" with each other.[25]  Such an

---

[22] "It is only by interpretations of the law that are in accord with the words of the lawmaker-- that is, interpretations in which judges look *outside* themselves for a source of law-- that the decisions of courts are truly removed from the realm of politics and policymaking." *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 761; 641 NW2d 567 (2002).

[23] "The powers of government are divided into three branches legislative, executive and judicial.  No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."  Const 1963, art 3, § 2.

[24] "[I]t is to the words of the statute itself that a citizen first looks for guidance in directing his actions.  This is the essence of the rule of law: to know in advance what the rules of society are."  *Robinson v Detroit*, 462 Mich 439, 467; 613 NW2d 307 (2000).

[25] In her assertion that this Court "has declined [during a four-year period] to find any statutory language ambiguous," *ante* at 10 n 23, the Chief Justice fails

24

understanding of ambiguity restricts the judge to saying what the law "is" based on the words chosen by the Legislature in all but the most extraordinary circumstances. While the Chief Justice suggests that the relative rarity of a finding that a law or contract is ambiguous under this definition constitutes its vice, *ante* at 23, by preserving a broader realm within which the ordinary process of interpretation may proceed, and in which deference will be shown to the decisions of the lawmaker, this may be better understood as its principal virtue.

*Many* disputes before this Court involve difficult or complex interpretations of statutes and contracts, yet it remains our responsibility to sort out these difficulties and complexities and finally determine what constitutes the *most reasonable*, if not always the perfect or the crystalline, meaning of the law. Judges have traditionally approached this responsibility by looking to the language of a statute or contract, considering relevant dictionary definitions of words and

---

to mention that this Court found the contract in *Klapp* itself to be ambiguous and then resolved this ambiguity by the application of the traditional rule *contra proferentem* (resolving a contract dispute against its drafter). See also *Stone v Williamson*, 482 Mich 144, 157; 753 NW2d 106 (2008). Perhaps more to the point, however, it is odd that the Chief Justice would make a *virtue* of a judge quickly throwing up his or her hands in the face of even a slightly difficult statute and dispensing with his or her obligation to say what the law means, while making a *vice* of a judge laboring hard to determine what even a highly difficult statute means in order to ensure that the legislative decisions of the people's representatives are respected.

phrases,[26] assessing the existence and meanings of "terms of art,"[27] evaluating the context of words[28] and grammatical, syntactical, and punctuational clues,[29] comparing related and companion provisions of the law,[30] discerning the organization and structure of statutes and contracts,[31] invoking traditional default rules and maxims of interpretation,[32] and applying proper understandings of legal purpose and precedent. [33]

---

[26] See *Koontz v Ameritech Services, Inc*, 466 Mich 304, 312; 645 NW2d 34 (2002) (stating that a court "may consult dictionary definitions" to help ascertain the meaning of terms not defined in the statute).

[27] "It is a cardinal rule in the interpretation of statutes that words which have acquired a well-defined technical meaning, are to be understood in their technical sense . . . ." *Pitcher v People*, 16 Mich 142, 147 (1867); see also MCL 8.3a.

[28] "[A] word or phrase is given meaning by its context or setting." *Tyler v Livonia Pub Schools*, 459 Mich 382, 391; 590 NW2d 560 (1999).

[29] See *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999) (stating that "statutory language must be read and understood in its grammatical context").

[30] "[I]n the interpretation of the statutes, we are to take into view all such parts as relate to the same subject." *Malonny v Mahar*, 1 Mich 26, 28 (1847).

[31] See *Lash v Traverse City*, 479 Mich 180, 190; 735 NW2d 628 (2007) (rejecting an argument regarding the statute's purported purpose as being "completely contrary to the structure of the statute").

[32] See, e.g., *In re Haley*, 476 Mich 180, 198; 720 NW2d 246 (2006) ("[W]here a statute contains a specific statutory provision and a related, but more general, provision, the specific one controls.").

[33] See *Pohutski v City of Allen Park*, 465 Mich 675, 694; 641 NW2d 219 (2002) (emphasizing that a crucial aspect to the proper understanding of precedent

This should not be understood as a mechanical process, for judges engaged conscientiously in this exercise will sometimes disagree about the meaning of the law, but it is a process in which the focus is directed *outwardly* toward the language of the statute or contract, rather than *inwardly* toward the personal predilections of the judge.[34] As Justice Felix Frankfurter once remarked, "the

is that it "should not be applied mechanically to prevent this Court from overruling erroneous decisions regarding the meaning of a statute").

[34] The Chief Justice disparages this approach by stating that a "'plain meaning' approach to statutory interpretation is equally susceptible to subjective and arbitrary determinations of legislative intent [because] such an approach may lead to the selection of one dictionary definition among many for a specific term." *Ante* at 13 n 35. The Chief Justice thus damns the very enterprise of judging by suggesting that it can never be anything other than "subjective" and "arbitrary," for words may sometimes have multiple meanings. The Chief Justice then defends her own approach to the judicial role by effectively declaring that all interpretation is nothing but a fiction in which the judge, one way or another, gets to impose his own personal will. That is, since interpretations of the law can sometimes be difficult, and may entail the application of judgment and discernment, a "plain meaning" approach to interpretation (a characterization incidentally never used by any of the justices dissenting in this case) has no superior stature to a post-ambiguity approach to interpretation in which words are given no respect whatsoever. By equating the imperfections inherent in a human process in which language is taken seriously with the fundamental defects inherent in a process in which language is subordinate to a judge's personal sense of which results are to be preferred, it is hard to imagine a more mistaken, and cynical, view of the judicial enterprise, albeit one that encapsulates well the persistent constitutional and jurisprudential divide between the justices in the majority and the dissenting justices.

Concerning *Liberty Hill Housing Corp v City of Livonia*, 480 Mich 44, 57; 746 NW2d 282 (2008), which the Chief Justice cites as somehow exemplifying the defects of the "plain meaning" approach, this Court explained:

The third, fourth, and fifth meanings in the definition are clearly not relevant here. The first meaning defines "occupy" as "to have, hold, . . . possess, . . . or claim[.]" These parts of the definition

27

highest exercise of judicial duty is to subordinate one's personal will and one's private views to the law."

## C. Premises of Ambiguity Rule

Despite the Chief Justice's view that an understanding of ambiguity does not constitute "binding precedent," she nonetheless undertakes a strenuous effort to identify precedents in support of her position, while undertaking no discernible effort to actually justify her own understanding. Rather than constituting an "aberrant" approach to interpretation, *ante* at 30 n 66, *Mayor of Lansing* and *Klapp* set forth a rule of statutory interpretation that, as with most other such rules, is grounded in logic and common sense, and is designed to faithfully ascertain the intentions of the Legislature. The understanding of ambiguity articulated in

---

are synonymous with ownership. Because the statute uses the conjunctive term "owned *and* occupied," however, the Legislature must have intended different meanings for the words "owned" and "occupied." Otherwise, the word "occupied" would be mere surplusage.

See also *id.* at 57 n 12. Thus, *Liberty Hill* relied on the maxim that the Court should avoid rendering a portion of the statute nugatory or surplusage, i.e., the Court should give effect to *all* the words of the Legislature. Thus, contrary to the Chief Justice's assertion, *Liberty Hill* demonstrated that a responsible judge, attempting faithfully to give meaning to the law, does not have "unfettered discretion to pick and choose among available 'plain meanings,'" *ante* at 22, but rather is bound by existing rules, and by interpretative approaches, that are well-known both to the judge and the parties beforehand. While such an "interpretivist" or "textualist" approach cannot dispense entirely with the exercise of judgment, unlike the approach preferred by the Chief Justice, the interpretative "rules of the game" under the former approach will be known in advance and are designed to reasonably ascertain the intentions of the lawmaker.

*Mayor of Lansing* and *Klapp* is premised upon longstanding principles of sound

constitutional government that are suggested by the following inquiries directed

toward those who would advocate a broader understanding:

> -- When ambiguity is discerned, ordinary rules of interpretation no longer apply-- as the Chief Justice asserts, a court may then "go beyond the plain language of a statute [or contract]"-- and judges are accorded broad and arbitrary discretion to pick and choose from among a wide variety of factors as to how the law should be given meaning. Why would any responsible legal system wish to depart from its ordinary processes, from ordinary rules of interpretation and traditional exercises of the judicial power, with any greater frequency than is absolutely required?

> -- When ambiguity is discerned, ordinary rules of interpretation no longer apply-- as the Chief Justice asserts, a court may then "go beyond the plain language of a statute [or contract]"-- and judges are accorded broad and arbitrary discretion to pick and choose from among a wide variety of factors as to how the law should be given meaning. Why would any responsible legal system wish to replace a reasonably predictable rule of law with arbitrary, and possibly idiosyncratic, determinations of judges any more often than is absolutely required?

> -- When ambiguity is discerned, ordinary rules of interpretation no longer apply-- as the Chief Justice asserts, a court may then "go beyond the plain language of a statute [or contract]"-- and judges are accorded broad and arbitrary discretion to pick and choose from among a wide variety of factors as to how the law should be given meaning. Why would any responsible legal system wish to minimize the realm in which judges are bound by the written law and instead maximize the realm in which written law is subrogated to a variety of indeterminate factors at a judge's disposal?

> -- When ambiguity is discerned, ordinary rules of interpretation no longer apply-- as the Chief Justice asserts, a court may then "go beyond the plain language of a statute [or contract]"-- and judges are accorded broad and arbitrary discretion to pick and choose from among a wide variety of factors as to how the law should be given meaning. Why would any responsible legal system wish to instill in litigants and the public the idea that the personal preferences of a

judge, rather than the requirements of the law, are what is most important to the resolution of a legal dispute?

-- When ambiguity is discerned, the "judicial power," the only power properly exercised by a judge under the Constitution, is exercised in a manner incompatible with its usual exercise-- as the Chief Justice asserts, a court may then "go beyond the plain language of a statute [or contract]." Why would any responsible legal system wish to depart from traditional constitutional norms or to obscure the Constitution's separation of powers?

By contrast, what logical or other arguments does the *Chief Justice* have for substantially expanding the range of judicial decision-making within which courts "may go beyond the plain language of the statute [or contract]," and within which "it is the duty of the courts," instead of the lawmaker, to give a "reasonable and sensible" interpretation to the law? *Ante* at 6. What conceivable arguments does the *Chief Justice* have for favoring an expansion in the range of judicial decision-making within which judges are empowered to devise, at their discretion, *ad hoc* and unpredictable criteria for determining how the law will be defined? Hers is a hollow opinion, evidenced not only by her failure to abide even by her *own* standards for identifying ambiguity, but also by her failure to articulate even a minimal justification for these standards.[35]

---

[35] The Chief Justice asserts that she need not justify her standard in light of the fact that other jurisdictions utilize similarly worded standards. *Ante* at 31 n 71. Whatever the relevance of this observation, one doubts that any of these variants have been applied in other jurisdictions in the wildly-overreaching manner reflected by the instant decision, reflected by the breadth of potentially "ambiguous" cases cited at n 21 *supra*, and reflected in the Chief Justice's own passion for finding "frequent ambiguity" in the law. *Haynes*, 477 Mich at 40 (Kelly, J., concurring).

## D. Logic of Ambiguity Rule

The Chief Justice asserts that language is ambiguous when it is "capable of being understood by reasonably well-informed persons in two or more different senses," *ante* at 33, but she never supplies any explanation for how this definition is to operate practically in the real world. She fails to answer, or even ask, whether there is some *threshold* beyond which it can be said that an interpretation is "capable of being understood by reasonably well-informed persons in two or more different senses." Is it sufficient, for example, in finding ambiguity that 10% or 20% or 30% of all "reasonably well-informed persons" might subscribe to a particular interpretation? Indeed, is it sufficient that the parties merely disagree, or must the Court intervene to determine that the position of each side is itself reasonable?

Given that the *Mayor of Lansing*/*Klapp* standard can be quantified as a 50% test-- i.e., if there are two equally reasonable interpretations, a law is ambiguous; otherwise it is not-- how would the Chief Justice characterize *her* standard? What is the approximate threshold at which a law should be found ambiguous? Unless *any* disagreement by *any* single "reasonably well-informed person" would be sufficient to trigger a finding of ambiguity, where is this threshold point? If 90 percent of all "reasonably well-informed persons" believe that the proper interpretation of a statute is X, and 10 percent believe that it is Y, or if a judge is 90% persuaded that the more reasonable interpretation is X, and 10% persuaded that it is Y, is there ambiguity? Obviously, the Chief Justice's threshold for

31

finding ambiguity falls somewhere below 50%, but approximately where? Are there any other areas of the law in which a judge, in the exercise of his fundamental obligation to interpret the law, must subordinate his or her own judgment concerning the meaning of the law to that of "reasonably well-informed [other] persons," or to any other group of persons?

Given that the Chief Justice's threshold must necessarily be less than 50%, why should that level ever be deemed sufficient to allow a judge to dispense with the language of a statute or contract as the dispositive factor in determining its meaning? That is, if a judge is 51% or 61% or 71% persuaded that some interpretation of the law is the better, or the "most reasonable," interpretation, what is the rationale for allowing a judge to interpret the law in some different fashion? Why would a judge ever adopt an interpretation that he or she believes is the second-best, or the second most reasonable, interpretation? If *any* interpretation of the law, concerning which a judge is less than 100% certain-- say a 95% certainty-- will ever permit that judge to adopt such interpretation as the better, or the "most reasonable" interpretation, what is the reason why a 51% or 61% or 71% interpretation should *not* prevail over a 29% or 39% or 49% interpretation-- much less with respect to what the Chief Justice describes as "more" interpretations that might be offered, see *ante* at 31, none of which may draw their legitimacy from the words of a statute or contract? Why shouldn't the better, or the "most reasonable," interpretation always prevail? Absent a perfectly clear statute or contract, why should a judge not prefer the 51% or 61% or 71%

interpretation?  Why should a 29% or 39% interpretation ever be placed on par with a 71% or 61% interpretation?  Indeed, why should a definition of ambiguity be adopted that allows a judge to determine that *neither* the 75% nor the 25% "most reasonable" interpretations will be adopted?  *Ante* at 31.  Why isn't it fair to conclude that the better, or the "most reasonable," interpretation-- which may be the 51% interpretation-- is simply the correct interpretation of the law?

The Chief Justice has little interest in parsing § 315(1), little interest in explaining why either of the parties' interpretations are "reasonable" or "unreasonable," and little interest in explaining why, in either constitutional or logical terms, her understanding of ambiguity makes sense, much less why it makes better sense than what *Mayor of Lansing* and *Klapp* have set forth.  Instead, the Chief Justice is content to proceed, without explanation, upon her deconstruction of the law of Michigan.

## E. No Previously-Established Rules

After her "analysis" of § 315(1)-- one consuming nearly a full paragraph and in which a sideways glance at the sentence immediately preceding the one in dispute is apparently seen as excessively rigorous-- the Chief Justice deems the statute "ambiguous," i.e., alternative interpretations could "reasonably apply."  She then proceeds to select from among the available "interpretative" tools and adopt those that purportedly support her result.  Apparently, for every ambiguous statute or contract reaching this Court, and there will be many such statutes and contracts if the Chief Justice's position ever prevails, she will re-embark upon this

"interpretative" process, picking and choosing at her discretion from among some uncertain array of tools lying "beyond the plain language of the statute [or contract]." See *Haynes*, 477 Mich at 48-49 (Markman, J., concurring), for a partial listing of such tools. The litigants will, of course, have no notice beforehand of which tools are to be employed, for the justices themselves will not know this beforehand. Among the universe of potential tools extending "beyond the plain language of the statute [or contract]," the Chief Justice will, by some means never quite explained, determine which of these are deemed to be relevant in interpreting the statute or contract in that case, and after several turns and twists of the mechanisms of her own internal Enigma machine, some result will emerge. One result will emerge if the "relevant" legislative history, for example, is the Senate committee report, another result will emerge if the "relevant" legislative history is the House committee report. Still other results will emerge if the "relevant" legislative history is comprised of the statements of the Senate or House committee chairman, the floor statements of the Senate or House majority leader, the committee testimony of witness A in the Senate or that of witnesses B, C, or D in the House, the staff analyses of the House or the Senate, or the floor colloquy of two random members of the House or two other random members of the Senate.[36]

---

[36] See, e.g., *Nat'l Pride*, in which the Chief Justice in her dissent proposed to give meaning to an allegedly "ambiguous" provision of our constitution by assessing the language of campaign brochures by private organizations, statements of the Michigan Civil Rights Commission, the results of a private telephone survey, and a "wealth of extrinsic information available." *Nat'l Pride*, 481 Mich

All in all, this is a fine process, except that it is not a legal or judicial process. Instead, it is a process in which judges in the very guise of selecting the tools and factors to be employed in "interpreting" the law are effectively its formulators-- in short, judges who are wielding the legislative, not the judicial, power.

A critical strength of a judicial philosophy committed to exercising only the constitution's "judicial power" is that reasonably clear rules of decision-making are established *before the fact*. That is, a judge essentially promises the parties that he or she will decide their case, as with all others, by attempting to discern the reasonable meaning of relevant statutes or contracts and that this will be done by relying upon recognized rules, and tools, of interpretation. By contrast, under the Chief Justice's approach to ambiguity, in which there is essentially a limitless array of rules, and tools, that may be employed for "defining" the law apart from its language, there is no consistently applied interpretative process with which the

---

at 95-96 (Kelly, J., dissenting). In response, the majority rejected her "apparent proposition that any stray bit of historical flotsam or jetsam can serve as guidance in giving meaning to the constitution." *Id.* at 84 n 25. See also Kelly, *The Fatal Weakness in the Michigan Supreme Court Majority's Textualist Approach to Statutory Construction*, 10 Thomas M. Cooley J Prac & Clinical L 287, 309 (2008), in which she describes the dissenting justices' "distrust" of legislative history, without evidencing any understanding of the basis for this "distrust," and without recognizing differing attitudes toward different types of legislative history. See, e.g., *supra* note 11. It should not go unremarked that in this case, it is the *dissent* that cites legislative history, albeit a uniquely persuasive and statutorily-grounded type of legislative history, as a relevant factor in interpreting § 315(1), while the Chief Justice, the presumed advocate of legislative history, for no apparent reason excludes this from her post-ambiguity toolbox. Why? Apparently because she can choose to consider this factor if she wants to, and she can choose not to consider this factor if she does not want to.

judge promises beforehand to comply. He or she may promise to be "fair," and he or she may seek to be fair, but there are no rules for how this fairness is to be achieved. There is only the promise that the judge will address each dispute on a case-by-case basis, using whatever rules, and whichever tools, he or she believes are required in that instance. And the suspicion simply cannot be avoided that these varying and indeterminate rules, and tools, may be largely a function of the outcome preferred by the judge and by his or her personal attitudes toward the parties and their causes. Any interpretative rules will be identified only *after the fact*, and these "rules" may or may not have been invoked in resolving yesterday's dispute, and may or may not be employed in resolving tomorrow's dispute. Any judge can concoct an *after-the-fact* rationale for a decision; the *judicial* process, however, is predicated upon *before-the-fact* rationales. An *ad hoc* process is not a judicial process at all. In the place of predetermined rules-- otherwise understood as the rule of law-- the Chief Justice would substitute rules to be determined later.[37]

---

[37] The arbitrariness of the Chief Justice's approach can be glimpsed in *Haynes*, 477 Mich at 45 (Kelly, J., concurring), in which we are instructed that whenever ambiguity arises, a judge may consider another jurisdiction's statute that is "substantially similar" to the Michigan statute before him or her. "[Foreign] case law interpreting [that jurisdiction's statute] is instructive with regard to the correct interpretation of our statute." *Id.* Yet, shortly thereafter in *DaimlerChrysler Corp v State Tax Comm*, 482 Mich at 241 (Kelly, J., concurring in the result), we are instructed by the same judge that, "[g]iven that these cases involve statutes that differ from Michigan's statutes, I find them of little assistance in determining the proper interpretation of the Michigan statute." Fair enough; distinctions may be legitimately made in these kinds of things. But where there

F. Chief Justice's Tools in This Case

What among the universe of available post-ambiguity tools does the Chief Justice choose to consider in reaching her decision here? The Chief Justice states that "caselaw," among other tools, supports her interpretation of § 315(1). In evaluating this factor, the Chief Justice mainly invokes broad "public policy" considerations. For example, the Chief Justice, citing *Harvlie v Jack Post Corp*, 2006 Mich ACO 69, emphasizes that the "WCAC has explicitly recognized the importance of holding employers and their insurance carriers responsible for a proration of attorney fees pursuant to § 315(1)." *Ante* at 35. Yet, in *Harvlie*, this "importance" was drawn from the following: "The attorney fee provision of Section 315 was *designed to promote the assistance of counsel* in medical dispute cases where there are minimal or no wage loss benefits from which to obtain an attorney fee." 2006 ACO 69, at 3 (emphasis added). In essence, *Harvlie* found that interpreting § 315(1)'s final sentence to require an employer to pay attorney fees made it more likely that an attorney would take a case in which the only recovery available was based on medical costs. Thus, the "importance" of

_____

are 49 other state jurisdictions in the United States, and thousands of other local jurisdictions, and millions of other private contracts entered into in these jurisdictions, it would not seem terribly difficult to identify somewhere and someplace a statute or contract whose interpretation can be invoked in support of an interpretation sought to be obtained in this state. Nor is there any apparent reason why in an appropriate case one of the Chief Justice's amorphous post-ambiguity tools could not consist of a judicial decision from France, New Guinea, or Azerbaijan. See, generally, *Roper v Simmons*, 543 US 551; 125 S Ct 1183; 161 L Ed 2d 1 (2005).

enforcing the majority interpretation is based on this putative "design" even though the reasoning in *Harvlie* in no way bears this out. The majority interpretation does not obviously "promote the assistance of counsel" because the employee's attorney recovers the same amount-- the contingency fee calculated on the recovered medical expenses-- regardless of who pays his fees. See *supra* notes 4 and 5. Thus, the supposed "design" set forth in *Harvlie* is a false one. Nonetheless, the Chief Justice insists that this reasoning somehow sustains her interpretation and supplies better guidance than the actual words of § 315(1).[38]

The Chief Justice next relies on *Boyce v Grand Rapids Asphalt Paving Co*, 117 Mich App 546, 552; 324 NW2d 28 (1982), in which, after resolving a workers' compensation attorney fees dispute on the grounds that an administrative rule did not allow an employee to recover fees from a medical provider or employer,[39] the court proceeded to opine that such a result did not serve "justice." However, whatever an individual judge's personal sense of "justice," it is the

---

[38] The Chief Justice also cites *Harvlie* for her "public policy" argument that if employers are not held liable for employees' attorney fees, employers will "have an incentive to deny medical benefits." *Ante* at 35. Yet, she never examines the consequences of the corollary "public policy" wherein employers would be penalized by attorney fees even if they have a *valid* dispute that the employee did not "receive[] a personal injury arising out of and in the course of employment." MCL 418.315(1).

[39] The Court of Appeals cases that followed also adhered to this rule. *Duran v Sollitt Constr Co*, 135 Mich App 610; 354 NW2d 277 (1984); *Zeeland Community Hosp v Vander Wal*, 134 Mich App 815; 351 NW2d 853 (1984); *Nezdropa v Wayne Co*, 152 Mich App 451; 394 NW2d 440 (1986).

responsibility of that judge to do "justice under law." Judges have no proper authority to countermand the decisions of the lawmaker by substituting a personal sense of "justice" for the justice of the law. I agree that there can be reasonable disagreement as to whether the position asserted by plaintiff or by defendants in this case is more "just." However, that question has never been thought to be dispositive, or even relevant, in giving meaning to statutes and contracts, and it is not made more dispositive or relevant because it was addressed by the lower court. Many persons, including judges, may have a strong personal sense of "justice"-- how public resources should be apportioned, how rights and responsibilities should be understood, how the limits of government should be defined-- but it is "justice *under law*" that is the tool of the trade of the judge and that defines the judicial power. Moreover, even if ascertaining what constituted abstract "justice" in the instant case *did* define this Court's mission, the Chief Justice never even purports to explain why *her* conception of "justice"-- requiring employers to pay employee's workers' compensation attorney fees-- is somehow superior to alternative conceptions of "justice," including that of the Legislature which has chosen to rely upon a different rule than the Chief Justice.[40]

---

[40] "The people have not forfeited lawmaking authority to a judicial aristocracy that may simply rewrite laws with which they disagree." *Karaczewski v Farbman Stein & Co*, 478 Mich 28, 43; 732 NW2d 56 (2007). The Chief Justice's reliance on her own personal brand of "justice" also suffers from the lack of virtue of "overturn[ing] compromises made in the legislative process, second-guess[ing] judgments of the lawmaker, and render[ing] the law increasingly arbitrary and unpredictable." *Rowland*, 477 Mich at 226 (Markman, J.,

The Chief Justice also relies on the WDCA's "remedial . . . nature" to support her interpretation. *Ante* at 34. The WDCA is indeed remedial, because it provides a remedy for employees injured on the job. Yet, the Chief Justice fails to explain why this purpose, as important as it obviously is, should be elevated above every other purpose of the Legislature. The WDCA is the Legislature's attempt to fulfill at least two purposes: "to 'provide . . . not only for employees a remedy which is both expeditious and independent of proof of fault, but also for employers a liability which is limited and determinate.'" *Simkins v Gen Motors Corp (After Remand)*, 453 Mich 703, 710; 556 NW2d 839 (1996) (citations omitted).[41] By arbitrarily establishing priorities among the several purposes of the WDCA, the Chief Justice undermines the real-world negotiations and compromises that were engaged in by the Legislature. In the place of a statute enacted by a majority of

concurring). It is also strange that, despite relying upon these post-ambiguity tools of "justice" and "public policy," neither the Chief Justice nor any other justice even made the slightest effort during oral argument to inquire into anything relevant regarding the "justice" or "public policy" of alternative interpretations of § 315(1), such as the economic impact of competing interpretations upon the health and competitiveness of Michigan's businesses, or the impact of competing interpretations upon workers' compensation insurance premiums. One might have thought such inquiries to be a useful precondition to judicial decisions predicated upon "justice" and "public policy."

[41] Most workers' compensation statutes "represent[] a compromise between the competing interests of disabled laborers and their employers." *Potomac Electric Power Co v Office of Workers' Compensation Programs Director*, 449 US 268, 282; 101 S Ct 509; 66 L Ed 446 (1980).

40

the 148 members of the Legislature, the majority interpretation substitutes a statute approved only by four judges acting well beyond their proper authority.

The Chief Justice then asserts that she is empowered to "construe the act's terms liberally," *ante* at 34-- rather than merely "reasonably." As a result of this process, one essentially indistinguishable from a judge asserting his or her right to place a thumb on the scales of justice, the Chief Justice proclaims that plaintiff is entitled under the WDCA to the greatest possible amount of recovery. *Ante* at 34. Is there anything more to the Chief Justice's "liberal" construction than that plaintiff prevails on everything? Is this all that is implied by a "liberal" construction? At what point does the Court decide that its "liberal" construction has fully accomplished the goals of the WDCA? When the employee receives all that he asks for? When an employer can no longer afford to maintain its insurance, or cannot afford to maintain an employee? Does a "liberal" construction militate in favor even of a recovery of benefits that is not contemplated by the actual language of the WDCA? Having declined from the outset to attempt any "reasonable" interpretation of § 315(1), the Chief Justice is far more enthusiastic about proclaiming "ambiguity" and immediately proceeding to a "liberal" interpretation. That is, in the place of an interpretation that is grounded in some meaningful way upon the law itself, the Chief Justice much prefers an "interpretation" that is not really an interpretation at all. She engages in what is merely a political impulse, rather than any serious construction of the law as might once have been expected from a justice of the Supreme Court of this

41

state.  Rather than working to achieve the "best" possible or "most reasonable" interpretation of the law, the Chief Justice, apparently fearing that little good would come from such an approach, instead exercises a power that does not belong to judges under the pretext that she is actually engaging in some genuine interpretation of the law, albeit a "liberal" interpretation.  While a genuine interpretation of the law is designed to achieve as perfect an understanding as possible of what the lawmaker has intended, a "liberal" interpretation appears here to be little more than a means to achieving a particular result.

In short, the Chief Justice invokes her own understanding of ambiguity for the purpose of providing some justification for her preferred course of "going beyond the plain language of the statute," and thereby avoiding the difficult process of giving fair meaning to a statute, the fair meaning of which may not be to her liking.  "No judge should manufacture ambiguity." *Paige v City of Sterling Hts*, 476 Mich 495, 542; 720 NW2d 219 (2006) (Cavanagh, J., concurring in part) (emphasis omitted).  Yet, there is no longer any need to "manufacture ambiguity" in light of the extraordinarily low threshold by which it can be found under the Chief Justice's definition.  In virtually every instance in which ambiguity is invoked, the Chief Justice would circumvent the actual language of a statute or contract in favor of her own notion of how that statute or contract should be configured.

## G. Stare Decisis

After stating that "stare decisis does not apply" to the *Mayor of Lansing* standard for determining ambiguity, *ante* at 14 n 36, the Chief Justice nonetheless devotes almost a third of her opinion to rejecting the stare decisis test in *Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000), constructing a new test, and then "apply[ing]" it to *Mayor of Lansing*. It should be emphasized that only one other justice is in agreement.[42] This leads to several reflections concerning the Chief Justice and precedent:

(1) The Chief Justice has repeatedly criticized other justices for "unnecessarily" overruling precedent.[43] What could be less "necessary" than to overturn a case she characterizes as nonbinding precedent? The Chief Justice has also previously stated that a departure from precedent must be supported by some

---

[42] Although the Chief Justice applies her newly-formulated "compelling justification" standard to conclude that *Mayor of Lansing* should be overruled, she neglects even to apply her new stare decisis standard to determine whether *Robinson* itself should be overruled. In this regard, see also *infra* note 47.

[43] See, for example, *People v Smith*, 478 Mich 292, 331; 733 NW2d 351 (2007) (Kelly, J., dissenting); *Rowland*, 477 Mich at 248 (Kelly, J., concurring in part and dissenting in part); *Joliet v Pitoniak*, 475 Mich 30, 46; 715 NW2d 60 (2006) (Kelly, J., dissenting); *Rory v Continental Ins Co*, 473 Mich 457, 492; 703 NW2d 23 (2005) (Kelly, J., dissenting); *People v Hickman*, 470 Mich 602, 618; 684 NW2d 267 (2004) (Kelly, J., dissenting); *People v Kazmierczak*, 461 Mich 411, 427; 605 NW2d 667 (2000); (Kelly, J., concurring in part and dissenting in part); *Mudel v Great Atlantic & Pacific Tea Co*, 462 Mich 691, 749; 614 NW2d 607 (2000) (Kelly, J., concurring in part and dissenting in part).

"special justification."[44]  What "special justification" could exist to overrule a case that she does not consider formally binding precedent?[45]

(2) Given that in this case the Chief Justice would expressly overrule, not one, but two of this Court's prior decisions,

> one is naturally tempted to re-inquire, see *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 223-228; 731 NW2d 41 (2007) (Markman, J., concurring), whether the ongoing dispute between the [former] majority and Justice Kelly over overrulings of precedent truly concerns attitudes toward stare decisis or merely attitudes toward particular previous decisions of this Court.  [*People v Smith*, 478 Mich 292, 322-323 n 17; 733 NW2d 351 (2007).]

"A justice's perspective on stare decisis is not evidenced by her willingness to maintain precedents with which she *agrees*, but by her willingness to maintain precedents with which she *disagrees.*"  *Rowland*, 477 Mich at 224-225 n 3 (Markman, J., concurring).  Now that the Chief Justice is positioned to overrule decisions with which she disagrees, her actions increasingly demonstrate that her former claims of fealty toward stare decisis were considerably overstated.  Despite all her rhetoric concerning the importance of stare decisis for the exercise of the judicial power, see, e.g., her hollow claim that she possessed a "differing [and

---

[44] See, for example, *People v Gardner*, 482 Mich 41, 85; 753 NW2d 78 (2008) (Kelly, J., dissenting); *Rowland*, 477 Mich at 254 (Kelly, J., concurring in part and dissenting in part); *People v Davis*, 472 Mich 156, 189; 695 NW2d 45 (2005) (Kelly, J., dissenting); *Hickman*, 470 Mich at 616 (Kelly, J., dissenting); *Robinson*, 462 Mich at 476 (Kelly, J., concurring in part and dissenting in part).

[45] Contrary to the Chief Justice's assertion, *ante* at 28 n 63, nowhere in this opinion is it stated that a standard for ambiguity is or is not "entitled to [stare decisis]" consideration.

elevated] esteem for stare decisis" than another justice, *People v Gardner*, 482

Mich 41, 88 n 31; 753 NW2d 78 (2008), such rhetoric was in reality little more

than a means of communicating her opposition to overruling *particular* past

decisions with which she agreed.[46]

(3) As I also asserted in *Rowland*, 477 Mich at 26:

[N]o meaningful discussion of a court's attitude toward precedent can be based solely on an arithmetical analysis in which raw numbers of overrulings are simply counted. Such an analysis obscures that not all precedents are built alike, that some are better reasoned than others, that some are grounded in the exercise of discretionary judgments and others in the interpretation of plain language, that some are thorough in their analyses and others superficial.

The chart attached to my concurring opinion in *Rowland* demonstrates that the

former majority's overrulings of precedent overwhelmingly occurred in cases

involving what the then-majority justices viewed as the "misinterpretation of

straightforward words and phrases in statutes and contracts, in which words that

were *not* there were read into the law or words that *were* there were read out of the

law." *Id.* at 226, 228-247. In contrast, the new majority's overrulings of

---

[46] The Chief Justice also stated in *Gardner*, 482 Mich at 87, that "stare decisis requires that we give those [earlier] decisions thoughtful and thorough consideration before tossing them aside." See also *Rowland*, 477 Mich at 256 ("The law has not changed. Only the individuals wearing the robes have changed. It is amazing how often the members of this majority have declared themselves more capable of understanding the law and reaching the "right" result than any justice who sat before.") (Kelly, J., concurring in part and dissenting in part); *Davis*, 472 Mich at 190 (overruling multiple cases "destabilizes our state's jurisprudence. It suggests to the public that the law is at the whim of whoever is

45

precedent has moved toward just the opposite result, replacing decisions that sought to give reasonable meaning to the words of the law with decisions in which "words that were *not* there were read into the law or words that *were* there were read out of the law." That is, when the previous majority overruled a precedent, it was to ensure that the decisions of this Court more closely reflected the judgments of the people's elected legislative representatives and it was to more closely align case law and statutory law. By contrast, when the new majority has overruled, or at least ignored, a precedent, it has been to create a greater disparity between that case law and the statutory law.

(4) Indeed, since Chief Justice Kelly became a part of the new majority, this majority has dealt with precedents it did not like in an especially inappropriate manner-- by simply ignoring them. In the interest of clearing the law of this state of multiple and inconsistent precedents on the same matters of law, the former majority forthrightly and explicitly overruled precedents and never sought to obscure this process or to misleadingly minimize the number of overturned precedents, by either ignoring disfavored precedents or by dubiously "distinguishing" prior case law. Doubtlessly, because it is cognizant of the gap between its past rhetoric extolling the importance of stare decisis and its present actions disregarding stare decisis, the new majority has made an increasingly

---

sitting on the Supreme Court bench. Surely, it erodes the public's confidence in our judicial system.").

regular practice of simply ignoring inconvenient precedents.[47]  As a result for

years to come, the clear rule of law will be stunted in this state as legal

_____

[47] See, e.g., *Vanslembrouck v Halperin*, 483 Mich 965 (2009), an order entered in which the new majority ignored *Vega v Lakeland Hosps*, 479 Mich 243; 736 NW2d 561 (2007); *Hardacre v Saginaw Vascular Services*, 483 Mich 918 (2009), an order in which it failed to follow *Boodt v Borgess Med Ctr*, 481 Mich 558; 751 NW2d 44 (2008); *Sazima v Shepherd Bar & Restaurant*, 483 Mich 924 (2009), an order in which it failed to follow *Chrysler v Blue Arrow Transport Lines*, 295 Mich 606; 295 NW 331 (1940), and *Camburn v Northwest School Dist (After Remand)*, 459 Mich 471; 592 NW2d 46 (1999); *Juarez v Holbrook*, 483 Mich 970 (2009), an order in which it failed to follow *Smith v Khouri*, 481 Mich 519; 751 NW2d 472 (2008); *Beasley v Michigan*, 483 Mich 1025 (2009), an order in which it failed to follow *Rowland*; *Scott v State Farm Mut Automobile Ins Co*, 483 Mich 1032 (2009), an order in which it failed to enforce *Thornton v Allstate Ins Co*, 425 Mich 643; 391 NW2d 320 (1986), and *Putkamer v Transamerica Ins Corp of America*, 454 Mich 626; 563 NW2d 683 (1997); *Chambers v Wayne Co Airport Auth*, 483 Mich 1081 (2009), an order in which it again failed to abide by *Rowland*; and *Bush v Shabahang*, 484 Mich ___; ___ NW2d ___ (issued July 29, 2009, Docket Nos. 136617, 136653, and 136983), in which it ignored *Roberts v Mecosta Co Gen Hosp (After Remand)*, 470 Mich 679; 684 NW2d 711 (2004) (*Roberts II*).

In addition to ignoring precedents altogether, see *Potter v McLeary*, 484 Mich ___; ___ NW2d ___ (issued July 31, 2009, Docket No. 136336), in which the new majority avoided overruling *Roberts II*, for an illustration of a seriously dubious "distinguishing" of precedent.  Such treatment of  inconvenient precedents, reflected also in the Chief Justice's "comprehensive response" to these charges, *ante* at 28 n 63, which cites *Potter*, 484 Mich at ___ (Kelly, C.J., concurring), may well reduce the number of occasions on which precedents have been explicitly overruled, but they do nothing to uphold the values of stare decisis, which would seem to be the whole purpose of the exercise, while allowing multiple and inconsistent precedents to define the law of this state.  In the end, there is no shortcut to resolving whether the new majority or the dissenting justices are correct in their characterizations of what the majority is doing.  We can only identify what we believe to be the questionable decisions of the majority, identify the relevant precedents, and invite the reader to reach his or her own conclusions.

practitioners and judges will be able to pick and choose between competing and inconsistent precedents.

(5)   The Chief Justice concludes that *Robinson*'s standard for overruling binding precedent is "insufficiently respectful of precedent" because "not once has the Court cited it as a basis for upholding a prior decision." *Ante* at 16-17. The Chief Justice, however, fails to illuminate the reader as to the number of occasions on which *she* has concluded that binding precedent was wrongly decided and yet joined an opinion maintaining that precedent. Perhaps, this is because the answer is "never." Not once has the Chief Justice joined an opinion finding a "compelling justification," or any other basis, for upholding a prior decision that she believed was wrongly decided.[48] More to the point, however, in disparaging the impact of *Robinson*, the Chief Justice disregards that cases in which *Robinson* would have been viewed as militating *against* an overruling of precedent would have been

---

[48] The Chief Justice responds that she has not upheld what she viewed as a wrongly decided precedent under the "compelling justification" standard because that "has *never* been the standard in Michigan during [her] years as a justice." *Ante* at 28 n 63. However, the point is that, even under her own similar "special justification" standard, see, e.g., *Gardner*, 482 Mich at 85 (Kelly, J., dissenting), or under *any other standard*, the Chief Justice has never joined an opinion to uphold what she viewed as a wrongly decided precedent. Her application of her "special justification" standard also belies her claim that she "followed *Robinson* in subsequent cases." *Ante* at 29 n 63.

48

precisely those cases in which there never would have been an opinion issuing from this Court in the first place.[49]

(6) In response to my concurring opinion in *Rowland*, then-Justice Kelly stated:

> Justice Markman challenges me to develop my "own standards" concerning when I would overturn precedent. But I have no need to create my own standards when well-reasoned standards have been established in the laws of this country for over 150 years. As noted in *McDowell* [*v Oyer*, 21 Pa 417, 423 (1853)], when precedents are "free from absurdity, not mischievous in practice, and consistent with one another," they should be retained. *McDowell*, 21 Pa at 423. I would not lightly adopt new rules to guide my judicial philosophy when traditional tools used by courts throughout their history continue to serve well. [*Rowland*, 477 Mich at 255 n 8 (Kelly, J., concurring in part and dissenting in part).]

However, the Chief Justice now apparently finds it necessary to depart from the 150-year old standard that she has previously hailed to fashion her own new "compelling justification" standard, with its seven evaluative criteria, and we are

---

[49] The Chief Justice also neglects to mention that *Robinson*, 462 Mich at 466 n 26, expressly identified two illustrative cases it likely would not have overruled even if it believed they had been wrongly decided. *Massey v Secretary of State*, 457 Mich 410; 579 NW2d 862 (1998), the case upholding term limits, and *Advisory Opinion re Constitutionality of 1972 PA 294*, 389 Mich 441; 208 NW2d 469 (1973), this Court's initial advisory opinion with regard to automobile no-fault insurance. See also *People v Lively*, 470 Mich 248, 259; 680 NW2d 878 (2004), (Markman, J., concurring) (finding it unnecessary to determine whether longstanding precedent should be overruled under *Robinson* standards); *People v Starks*, 473 Mich 227, 251; 701 NW2d 136 (2005) (Markman, J., joining concurring opinion stating it was unnecessary to overrule a prior case).

49

left to ponder why she no longer views the "free from absurdity, not mischievous in practice, and consistent with another" standard as a sufficient test.[50]

Moreover, it is perplexing why the Chief Justice feels that it is necessary to overrule *Robinson* and replace it with her new test given the similarity of these standards.[51]  Why, to use her own standards, is this "necessary" and what is the

---

[50] It also should not be lost on the reader that these criteria are nothing more than a hodgepodge thrown together without any prior case law in support.  Given her criticism that the test for ambiguity set forth in *Mayor of Lansing* was made up out of "thin air," *ante* at 11, one might think the Chief Justice would be especially careful to identify at least one or two courts that have utilized her own new criteria.

[51] Under the Chief Justice's standard, stare decisis analysis "begin[s] with the presumption that upholding the precedent involved is the preferred course of action."  *Ante* at 17.  Under *Robinson*, "[s]tare decisis is generally 'the preferred course.'"  *Robinson*, 462 Mich at 463 (citation omitted).  Under the Chief Justice's standard, we are to consider whether the precedent "has proven to be intolerable because it defies practical workability."  *Ante* at 21.  Under *Robinson*, we considered "whether the precedent "defies 'practical workability.'"  *Robinson*, 462 Mich at 464.  Under the Chief Justice's standard, a court is to consider "whether reliance on the [precedent] is such that overruling it would cause a special hardship and inequity."  *Ante* at 21.  Under *Robinson*, we considered "whether reliance interests would work an undue hardship."  *Robinson*, 462 Mich at 464.  Under the Chief Justice's standard, we are to consider "whether related principles of law have so far developed since the rule was pronounced that no more than a remnant of the rule has survived."  *Ante* at 21.  Under *Robinson*, we considered "whether changes in the law . . . no longer justify the questioned decision."  *Robinson*, 462 Mich at 464.  Under the Chief Justice's standard, we are to consider "whether facts and circumstances have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification."  *Ante* at 18.  Under *Robinson*, we considered "whether changes in the . . . facts no longer justify the questioned decision."  *Robinson*, 462 Mich at 464.  Under the Chief Justice's standard, we are to consider "whether other jurisdictions have decided similar issues in a different manner."  *Ante* at 21.  Under *Robinson*, we considered both the "practical workability" of the questioned decision and "changes in the law," under which decisions from other jurisdictions

"compelling justification" for doing this?  Indeed, given the Chief Justice's statements that the "*application* [of *Robinson*] has proven superficial and cursory," *ante* at 16, and that *Robinson*, "as previously applied" is "insufficiently respectful of precedent," *ante* at 17, one has to wonder whether her  real concern is not with the *Robinson* test itself, but merely with what she views as the *misapplication* of that test.

## V. CONCLUSION

I would reverse the Court of Appeals because the final sentence of MCL 418.315(1) does not allow a magistrate to assess an employee's attorney fees

---

could be used to address each factor.  *Robinson*, 462 Mich at 464.  Under the Chief Justice's standard, we are to consider "whether upholding the rule is likely to result in serious detriment prejudicial to public interests."  *Ante* at 21.  Under *Robinson*, we considered both the "practical workability" of the questioned decision and "changes in the law or facts that no longer justify the questioned decision," *Robinson*, 462 Mich at 464, and each of these factors gave consideration, in the Chief Justice's language, to "whether upholding the rule is likely to result in serious detriment prejudicial to public interests."  *Ante* at 21.

The final factor in the Chief Justice's new test-- "whether the prior decision was an abrupt and largely unexplained departure from precedent," *ante* at 21-- ignores two aspects of this Court's former approach to stare decisis.  First, by establishing a "lower level of deference" for cases that themselves have overruled precedent, the Chief Justice disregards that the particular precedents she so disfavors themselves often overruled decisions that "depart[ed] from precedent." *Ante* at 21.  See the chart in *Rowland*, 477 Mich at 228-247 (Markman, J., concurring), for a list of such decisions.  Does the Chief Justice take this into account in her calculus?  Second, I can only invite those interested in the workings of their judiciary to read the decisions of this Court in which the former majority overruled precedent, see *id.* at 223, and compare these with the decisions in which the new majority has now overruled or ignored precedent, see *supra* note 47, and assess which of these have been most "unexplained" or "abrupt."

against the employer. Rather, that sentence only allows a magistrate to divide attorney fees among medical providers when the magistrate has ordered direct payment for medical expenses from the employer to those providers.

Stephen J. Markman
Maura D. Corrigan